SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court and may not summarize all portions of the opinion.

**Carol Ann Conforti v. County of Ocean** (A-1-22) (086206)

**Argued January 30, 2023 -- Decided August 10, 2023**

**WAINER APTER, J., writing for the Court.**

The Court considers whether the Ocean County defendants are immune from liability by provisions of the New Jersey Tort Claims Act (TCA) in a negligence suit brought by plaintiff Carol Ann Conforti, whose husband, Kenneth Conforti, hung himself while incarcerated at the Ocean County Jail (OCJ).

In summer 2010, plaintiff obtained a restraining order against her husband. On September 8, he was arrested for violating the restraining order by returning to the marital home to see his son. Conforti was taken to the OCJ, where he was evaluated by a staff member of Correctional Health Services (CHS). A CHS staff member wrote on the "Intake Receiving and Screening" form that Conforti reported (1) drinking half a gallon of vodka each day; (2) major surgery that left him with rods and screws in his back; (3) feeling "hopeless or helpless"; and (4) the "[r]ecent significant loss" of his marriage. A physician prescribed him one extra mattress and medicine for back pain and alcohol dependence, and instructed that he not be assigned work or a top bunk. After 27 days, Conforti was released.

Just over a week later, Conforti was arrested for again returning to the marital home to see his son. He arrived at OCJ on October 13, 2010. During his intake, a CHS nurse, Kelly Clough, filled out the same form that had been filled out in September, but noted this time that Conforti reported no major surgical history, did not "feel helpless or hopeless," had no "[r]ecent significant loss," and was only a "social" drinker. A document from Conforti's file acknowledged his previous incarceration and history of binge drinking but stated he had "[n]o current mental health issues/concerns" and was cleared for OCJ's general population.

Initially assigned to a cell in which he had a bunk, Conforti was transferred to a cell in which he had to sleep on the floor. On October 16, he requested medical attention for back pain. Two days later, Clough said he could purchase Motrin or Tylenol. On October 20, Conforti wrote a suicide note to his parents, closed the door to his cell, covered the cell door window with a sheet, and hung himself.

1

Testimony at trial established that an inmate closing a cell door would cause the door to lock automatically and trigger a light to alert staff. Surveillance footage of areas outside Conforti's cell existed and was preserved after his death, but an OCJ warden testified that it subsequently became unviewable for technological reasons. The OCJ Suicide Prevention Policy states that officers "should make unsystematic patrols of the housing area" to "hinder the inmate's efforts" of timing the patrols and to "increase the possibility of successful intervention." Yet the logbook indicates checks on Conforti's cell block on October 20 at 8:03 a.m., 9:02 a.m., 9:56 a.m., 11:02 a.m., and 12:03 p.m. Any change in the logbook was supposed to be initialed, with a reason provided. Despite that, the time of the entry that followed the 12:03 p.m. health and welfare check was overwritten or obliterated with a 12:55 p.m. notation for "[p]ossible [s]uicide." There was no reason provided, and no initials.

During discovery, plaintiff submitted an expert report from Martin Horn, who opined that defendants acted negligently by failing to adequately train and supervise OCJ staff to prevent inmate suicide; failing to adopt and implement an adequate suicide prevention policy; failing to follow OCJ's existing Suicide Prevention Policy; failing to conduct mortality reviews and revise policies after inmate suicides; failing to "recognize Mr. Conforti presented a risk of suicide"; housing Conforti in an occupied single-bunk cell, ensuring he had no bunk to sleep on; "[f]ailing to recognize or appreciate the danger of a closed and locked cell door with a towel covering the door"; and "[e]ngaging in predictable and easily timed and anticipated patrols of the cell block when the . . . Policy prohibited systematic patrols."

The County defendants moved for summary judgment, maintaining in part that OCJ was a medical facility under N.J.S.A. 59:6-1 and was therefore immune from liability under provisions of the TCA, N.J.S.A. 59:6-4, -5, and -6. The trial court refused to dismiss plaintiff's negligence claim, saying nothing about the TCA. At trial, the parties presented competing fact and expert testimony regarding negligence and causation. The jury found defendants negligent and apportioned liability 60% against the County defendants and 40% against CHS. Defendants moved for judgment notwithstanding the verdict (JNOV), in part reasserting their medical-facility-immunity argument. The judge denied the motion. Defendants appealed, contending for the first time that the immunities granted in 6-4, -5, and -6 were not limited to medical facilities. The Appellate Division affirmed. The Court granted defendants' petition for certification, 252 N.J. 53 (2022), and denied plaintiff's cross-petition, 252 N.J. 25 (2022).

**HELD:** The definition of "medical facility" under N.J.S.A. 59:6-1 does not restrict the substantive immunities granted in N.J.S.A. 59:6-4, -5, or -6, which are also not "superseded in the jail suicide context." However, there was evidence presented in this case, both at the summary judgment stage and at trial, that falls outside of any immunities granted by N.J.S.A. 59:6-4, -5, and -6. The jury could reasonably have

concluded from that evidence that the County defendants were negligent.  The trial court was therefore correct to refuse to dismiss plaintiff's negligence count at the summary judgment stage and to refuse to overturn the jury's verdict after trial.  The Court accordingly affirms the judgment of the Appellate Division, as modified.

1.  The guiding principle of the TCA is that immunity from tort liability is the general rule and liability is the exception.  N.J.S.A. 59:6-1 defines "medical facility" as "a hospital, infirmary, clinic, dispensary, mental institution, or similar facility." The County defendants argue that, despite that definition their conduct was immunized by three separate substantive provisions of Chapter Six:  N.J.S.A. 59:6-4, which grants absolute immunity for a public entity or public employee's failure to perform an adequate examination to determine whether a person has a physical or mental condition which would be hazardous to that person or others, unless the examination is for the purpose of treatment; N.J.S.A. 59:6-5, which grants immunity to public entities and employees for diagnosing or failing to diagnose "that a person has a mental illness" or drug use disorder, and from failing to prescribe treatment for a mental illness or drug use disorder; and N.J.S.A. 59:6-6, which grants immunity for decisions regarding whether to confine a person for mental illness or drug dependence, and the terms and conditions of such confinement or release.  N.J.S.A. 59:6-1's definitions section does not limit the substantive immunities provided by 59:6-4, -5, or -6 to "medical facilities," and the immunities set forth in 59:6-4, -5, and -6 are not "inapplicable in jail suicide cases" or "superseded in the jail suicide context."  In theory, therefore, defendants could be immunized from liability for specific conduct under 59:6-4, -5, and -6.  (pp. 25-29)

2.  However, because there was evidence here from which the jury could have concluded that the County defendants were negligent beyond any immunities possibly granted by N.J.S.A. 59:6-4, -5, and -6, the trial court was correct to refuse to dismiss plaintiff's negligence count at the summary judgment stage and to refuse to overturn the jury's verdict after trial.  Reviewing the grounds on which Horn's report opined that the County defendants were negligent, the Court finds that, even though the trial court was wrong in failing to address defendants' arguments under the TCA at the summary judgment stage, it did not err in refusing to dismiss the negligence count because there was evidence from which a jury could find negligence without reference to any immunized conduct.  And at trial, the jury heard voluminous testimony about the County defendants' negligence that was unrelated to any conduct immunized under 59:6-4, -5, and -6, including testimony from Horn. While defendants' expert refuted Horn's testimony, it was up to the jury to decide which expert to believe.  The jury was also free to rely on the existing OCJ Suicide Prevention Policy, admitted at trial, which provides that an "officer should make unsystematic patrols of the housing areas," and to infer culpability against the County defendants from the "conveniently overwritten log entry and unavailable security footage."  (pp. 29-32)

3

3.  The Court addresses arguments about the specific procedural history of this case. (pp. 32-37)

4.  Because the jury's verdict here is supported by non-immunized conduct introduced at trial, this case is not like others in which a claim against a public entity or public employee was held immunized by N.J.S.A. 59:6-4, -5, or -6, and the Court does not reach the contours of immunity under those provisions.  The Court does note, however, that the Appellate Division erred when it stated that defendants had no immunity under 59:6-4 "regarding [Conforti]'s medical intake, which was done to assess his OCJ confinement and not conducted for treatment purposes."  That is the opposite of what 59:6-4 actually says.  N.J.S.A. 59:6-4 applies only to exams that are <u>not conducted</u> "for the purpose of treatment" and explicitly denies immunity when examinations are conducted for treatment purposes.  (pp. 37-39)

**AFFIRMED AS MODIFIED.**

**JUSTICE FASCIALE, concurring in part and dissenting in part,** agrees that the definition of "medical facility" does not restrict the substantive immunities granted in N.J.S.A. 59:6-4, -5, or -6; that the immunities granted by those statutes to public entities and public employees are not superseded in the jail suicide context; and that the trial judge correctly denied summary judgment as to that part of the negligence count alleging damages premised on evidence that falls outside of any immunities granted.  In Justice Fasciale's view, however, the trial judge should have granted summary judgment to the extent that plaintiff's negligence claim is derived from conduct immunized under N.J.S.A. 59:6-4, -5, and possibly -6.  Because the court denied the motion in its entirety, Justice Fasciale explains, plaintiff was able to present evidence that was immunized under the TCA and to make arguments based in part on immunized conduct.  The cumulative effect of those combined mistakes denied the County defendants a fair trial, Justice Fasciale writes.

**CHIEF JUSTICE RABNER and JUSTICES SOLOMON and PIERRE-LOUIS join in JUSTICE WAINER APTER's opinion.  JUSTICE FASCIALE filed an opinion concurring in part and dissenting in part, in which JUSTICE PATTERSON joins.  JUDGE SABATINO (temporarily assigned) did not participate.**

4

# SUPREME COURT OF NEW JERSEY
A-1 September Term 2022

086206

---

Carol Ann Conforti,
individually and as administratrix
ad prosequendum of the Estate of
Kenneth Conforti and as parent
natural guardian and guardian ad
litem of A.C., a minor,

Plaintiff-Respondent,

v.

County of Ocean, Ocean
County Board of Chosen
Freeholders, in their
individual and official capacities,
Ocean County Department
of Corrections, Warden
Theodore J. Hutler, in his
individual and official capacity,
and Corporal Petrizzo,

Defendants-Appellants,

and

Correctional Health
Services, LLC, Prison
Health Services, Inc.,
and Kelly Clough,

Defendants.

1

On certification to the Superior Court,
Appellate Division.

| Argued | Decided |
| January 30, 2023 | August 10, 2023 |

Vito A. Gagliardi, Jr., argued the cause for appellants
(Porzio, Bromberg & Newman, attorneys; Vito A.
Gagliardi, Jr., of counsel and on the briefs, and Eliyahu
S. Scheiman and Thomas J. Reilly, on the briefs).

Donald F. Burke, Jr., argued the cause for respondent
(Law Office of Donald F. Burke, attorneys; Donald F.
Burke, on the brief).

Michael J. Epstein argued the cause for amicus curiae
New Jersey Association for Justice (The Epstein Law
Firm, attorneys; Michael J. Epstein, of counsel and on the
brief, and Michael A. Rabasca, on the brief).

Karen Thompson argued the cause for amicus curiae
American Civil Liberties Union of New Jersey (American
Civil Liberties Union of New Jersey Foundation,
attorneys; Karen Thompson, Alexander Shalom, and
Jeanne LoCicero, on the brief).

JUSTICE WAINER APTER delivered the opinion of the Court.

On October 20, 2010, Kenneth Conforti wrote a suicide note, closed the

door to his cell at the Ocean County Jail (OCJ), and covered the cell door

window with a sheet. He then tied bedsheets together and hung himself from a

ceiling light fixture over the toilet.

2

Plaintiff, Kenneth Conforti's wife, sued Ocean County, the Ocean County Board of Chosen Freeholders, the Ocean County Department of Corrections, retired OCJ Warden Theodore Hutler, and OCJ Corporal Peter Petrizzo (collectively, County defendants or defendants) for negligence and a violation of the New Jersey Civil Rights Act (NJCRA). After a trial, the jury found defendants negligent and awarded damages to plaintiff.

Defendants claim they are immune from liability for negligence by provisions of the New Jersey Tort Claims Act (TCA), N.J.S.A. 59:6-4, -5, and -6, and the jury's verdict against them must therefore be overturned. We agree with defendants that the definition of "medical facility" under N.J.S.A. 59:6-1 does not restrict the substantive immunities granted in N.J.S.A. 59:6-4, -5, or -6. As defendants point out, none of those three provisions are limited to medical facilities. Instead, they grant immunities to public entities and public employees. We also agree with defendants that the immunities set forth in N.J.S.A. 59:6-4, -5, and -6 are not "superseded in the jail suicide context."

However, there was evidence presented in this case, both at the summary judgment stage and at trial, that falls outside of any immunities granted by N.J.S.A. 59:6-4, -5, and -6. The jury could reasonably have concluded from that evidence that the County defendants were negligent. The trial court was therefore correct to refuse to dismiss plaintiff's negligence count at the

3

summary judgment stage and to refuse to overturn the jury's verdict after trial. We accordingly affirm the judgment of the Appellate Division, as modified.

## I.

## A.

Kenneth Conforti (Conforti) became totally disabled due to a workplace injury to his back. After unsuccessful surgery, he was left in chronic pain. He initially obtained medical treatment through worker's compensation, but after treatment terminated, he began self-medicating with alcohol. In the summer of 2010, his wife, plaintiff Carol Ann Conforti, obtained a restraining order against him, and he moved in with his sister. On September 8, 2010, Conforti was arrested for violating the restraining order by returning to the marital home to see his then-nine-year-old son, A.C. A.C. has Down syndrome and is deaf and non-verbal.

Conforti was taken to the OCJ, where he was evaluated by a staff member of defendant Correctional Health Services (CHS). Pursuant to a contract with the Ocean County Department of Corrections (DOC), CHS provided all medical and mental health services to OCJ inmates, including intake evaluations, examinations, screenings, and treatment. A CHS staff member wrote on the "Intake Receiving and Screening" form that Conforti reported (1) drinking half a gallon of vodka each day; (2) major surgery that

4

left him with rods and screws in his back; (3) feeling "hopeless or helpless"; and (4) the "[r]ecent significant loss" of his marriage. The form indicated that Conforti denied use of any pain or psychotropic medication, any history of anxiety or depression or any other mental health disorder, and any history of suicide attempts or suicidal thoughts.

Because of his reported alcohol abuse, Conforti was admitted to OCJ's medical unit for observation. He also underwent a psychiatric evaluation, during which he reported no psychiatric symptoms and denied any psychiatric history, anxiety or depression, suicidal ideations, or history of suicide attempts. After exhibiting no symptoms of alcohol withdrawal, Conforti was cleared to enter OCJ's general population on September 10. A physician prescribed him one extra mattress and 600 mg of Motrin for chronic back pain, and instructed that he not be assigned work or a top bunk. For alcohol dependence, Conforti was given a multi-vitamin and the medication Librium. After twenty-seven days in jail, Conforti was released on October 4, 2010.

Just over a week later, Conforti was arrested for again violating the restraining order by returning to the marital home to see A.C. He arrived at OCJ on October 13, 2010. During his intake with a CHS nurse, Kelly Clough, Conforti indicated he had never previously been incarcerated at OCJ. Clough took Conforti at his word and filled out the same "Intake Receiving and

5

Screening" form that had been filled out by a CHS staff member in September. This time, though, Clough marked on the form that Conforti reported no major surgical history, did not "feel helpless or hopeless," had no "[r]ecent significant loss," and was only a "social" drinker. Although Conforti was admitted to the jail with the same inmate number he had in September, and records from his earlier incarceration were thus available to her, Clough did not review them.

However, a document from Conforti's file titled "Progress Notes," written on October 14 by CHS mental health staff, indicated that Conforti was seen "upon his return to OC jail" and had been previously incarcerated in the jail on September 10 for the same offense. The note reported that Conforti had a "[history] of binge drinking" but denied recent use, denied current suicidal thoughts, had no psychological history, and had "[n]o current mental health issues/concerns." It therefore indicated he was cleared for OCJ's general population.

Conforti was initially assigned to a cell with two beds, but was then transferred to a cell with one bed, which was already occupied by another inmate. Conforti thus had to sleep on the floor. On October 16, Conforti requested medical attention for back pain. Two days later, Clough responded that he could purchase Motrin or Tylenol from the commissary.

On October 20, 2010, Conforti wrote a suicide note to his parents, stating that death was "the only way for [him] to stop" -- otherwise, he "would have continued to drink and get locked up." He dated the note "10/20/10, 9:32 am." At some point thereafter, Conforti closed the door to his cell, causing it to lock automatically, and covered the cell door window with a sheet. He then tied bedsheets together and hung himself from a ceiling light fixture over the toilet.

Testimony at trial established that an inmate closing a cell door would cause the door to lock automatically and trigger a light in the control tower to alert staff that the door was locked. An officer was stationed in the control tower -- a raised glass enclosure -- at all times to monitor such alerts and to supervise the inmates both through the glass and through video surveillance. Surveillance footage of the hallways, general housing areas outside Conforti's cell, and the outside of cell doors existed and was preserved after Conforti's death. However, Warden Sandra Mueller testified that it subsequently became unviewable for technological reasons.

Corporal Peter Petrizzo, filling in as a floor officer in Conforti's housing unit on October 20, testified that he was required to walk the 130-inmate unit once per hour for health and welfare checks, to ensure the inmates were safe

7

and abiding by OCJ policies. That included OCJ rules that "[c]ell doors will remain unobstructed with no items hung on or over the door."

According to Corporal Petrizzo, the checks had to be conducted hourly, and he switched the order of the cell blocks so that he would not check the same cell block at the same time each hour. The OCJ Suicide Prevention Policy specifically states that officers "should make unsystematic patrols of the housing area" to "hinder the inmate's efforts" of timing the patrols and to "increase the possibility of successful intervention" if an inmate were to attempt suicide. Yet the health and welfare logbook indicates that Corporal Petrizzo checked Conforti's cell block on October 20 at 8:03 a.m., 9:02 a.m., 9:56 a.m., 11:02 a.m., and 12:03 p.m.

It is not clear exactly when DOC staff first responded to a "possible suicide" in Conforti's housing unit. The logbook was maintained by the tower officer, and any change was supposed to be initialed, with a reason provided for the change. Despite that, the time of the entry that followed the 12:03 p.m. health and welfare check was overwritten or obliterated with a 12:55 p.m. notation for "[p]ossible [s]uicide." There was no reason provided, and no initials.

After Conforti was discovered and his cell door unlocked, officers performed CPR.  An autopsy eventually confirmed that Conforti died of asphyxiation by hanging.

B.

On August 20, 2015, plaintiff, as administratrix ad prosequendum of Conforti's estate, sued the County defendants and Correctional Health Services, LLC, its successor-in-interest Prison Health Services, Inc., and Kelly Clough (collectively, CHS defendants), in the Ocean County Law Division. Plaintiff's complaint raised two counts against the County defendants: (1) negligence and (2) violations of the New Jersey Civil Rights Act.  The CHS defendants settled with plaintiff prior to trial.

During discovery, plaintiff submitted an expert report from Martin Horn, former Secretary of Corrections for the State of Pennsylvania, and former Commissioner of the New York City Department of Correction.  Horn opined that the County defendants acted unreasonably, negligently, or with deliberate indifference by failing to adequately train and supervise OCJ staff to prevent inmate suicide; failing to adopt and implement an adequate suicide prevention policy; failing to follow OCJ's existing Suicide Prevention Policy; failing to conduct mortality reviews and revise policies accordingly after inmate suicides; failing to "recognize Mr. Conforti presented a risk of suicide";

9

"[h]ousing Mr. Conforti in a single [bunk cell] already occupied by an inmate (ensuring he had no bunk to sleep on)"; "[f]ailing to recognize or appreciate the danger of a closed and locked cell door with a towel covering the door either through patrols or video surveillance"; and "[e]ngaging in predictable and easily timed and anticipated patrols of the cell block when the Suicide Prevention Policy prohibited systematic patrols."

The County defendants moved for summary judgment seeking to dismiss both the negligence and NJCRA counts.

They argued the NJCRA claim must be dismissed because plaintiff could not establish: (1) an unconstitutional policy under Monell v. Dep't. of Soc. Servs., 436 U.S. 658 (1978); (2) that prison officials knew or should have known that Conforti had a "particular vulnerability to suicide"; or (3) that they acted with "reckless indifference."

The County defendants contended the negligence count must be dismissed because: (1) plaintiff could not establish that they breached any duty owed to Conforti; (2) intake and mental health evaluations were completed by CHS, not by them; (3) Conforti himself denied feelings of helplessness or hopelessness and denied any mental health history; (4) no one at OCJ "could reasonably have foreseen that Mr. Conforti would take his own life"; and (5) no medical or mental health information was passed by CHS to

10

the County defendants because of Health Insurance Portability and Accountability Act of 1996 (HIPAA) regulations.

Defendants also maintained that OCJ was a medical facility under N.J.S.A. 59:6-1 and was therefore immune from liability under provisions of Chapter Six of the TCA, "Medical, Hospital and Public Health Activities," codified at N.J.S.A. 59:6-4, -5, and -6. Defendants reasoned that because OCJ "provides medical services in its medical unit, or infirmary, for all prison inmates," and "provides dental care for the inmates," it should be deemed a "medical facility" under 59:6-1 and therefore entitled to immunity under 59:6-4, -5, and -6. N.J.S.A. 59:6-1 defines "medical facility" as "a hospital, infirmary, clinic, dispensary, mental institution, or similar facility."

In support of this point, defendants quoted the text of 59:6-4 ("[f]ailure to make physical or mental examination or to make adequate physical or mental examination"), 59:6-5 ("failure to diagnose certain conditions"), and 59:6-6 (determination of terms of confinement). They also discussed Charpentier v. Godsil, 937 F.2d 859 (3d Cir. 1991).[1] They then reiterated: "It

---

[1] Charpentier did not hold that N.J.S.A. 59:6-4, -5, and -6 apply only to medical facilities, or that a jail is a medical facility under the TCA. In Charpentier, a person with bipolar manic-depressive psychosis was incarcerated in the Monmouth County Correctional Institution (MCCI) and sustained injuries during a psychotic episode. 937 F.2d at 861. He sued a physician employed by MCCI for prescribing him a tranquilizer injection but

11

is clear from the foregoing case that <u>a county correctional facility is considered a medical facility under New Jersey law and that, therefore, Defendants in this matter are entitled to the applicable immunities contained in chapter six of the TCA</u>."[2] (emphasis added).

Plaintiff interpreted defendants to be arguing that they were entitled to immunity under N.J.S.A. 59:6-4, -5, and -6 because OCJ was a medical facility

---

failing to personally examine him, failing to make any diagnosis, and failing to prescribe any other treatment, including transfer to a psychiatric or medical facility. <u>Id.</u> at 862. The Third Circuit held that the doctor was not immune under 59:6-5 for the allegedly wrongful injection of the tranquilizer, because 6-5(a) specifically provides "nothing in this subsection exonerates a public entity or a public employee who has undertaken to prescribe for mental illness . . . from liability for injury proximately caused by [] negligence or by [a] wrongful act in so prescribing." <u>Id.</u> at 864 (quoting N.J.S.A. 59:6-5(a)). However, the court found the doctor was immune under 59:6-5 for failure to prescribe any other treatment for mental illness, including transfer to a psychiatric or medical facility. <u>Id.</u> at 866-67.

[2] The dissent focuses on the two lines in defendants' summary judgment brief that arguably broadened their argument to go beyond medical facilities. The first is: "Nevertheless, any alleged failure to recognize Mr. Conforti's mental state or suicidal inclination is immunized by the plain language of both N.J.S.A. 59:6-4 and 6-5." The second is: "The foregoing notwithstanding, . . . to the extent Plaintiff alleges that [the County defendants] failed to properly diagnose Mr. Conforti's mental state, they are entitled to the immunities provided under the [TCA] for medical and public health activities." However, both of those sentences appeared <u>after</u> the sentence in which defendants made clear they believed they were entitled to immunity under 6-4 and 6-5 <u>only</u> <u>because</u> OCJ was a medical facility under 6-1: "It is clear from the foregoing . . . that <u>a county correctional facility is considered a medical facility under New Jersey law and that, therefore, Defendants in this matter are entitled to the applicable immunities contained in chapter six of the TCA</u>." (emphasis added).

12

under N.J.S.A. 59:6-1. In opposition, plaintiff responded that OCJ did not fall within the definition of a "medical facility" in 59:6-1 and was therefore not entitled to immunity under 59:6-4, -5, or -6. Defendants' reply brief did not mention the TCA.

At oral argument on defendants' motion for summary judgment, the trial court unsuccessfully tried to elicit additional information about defendants' TCA arguments. Counsel for defendants initially sought to "rely on the argument in the brief" for TCA immunities. The trial court then asked: "with respect to those . . . tort claims, what, if any, immunities come into play?" Counsel reiterated that Conforti's mental health assessment was conducted by CHS, not OCJ; Conforti did not report any mental health history and denied thoughts of suicide; and Conforti did not tell Nurse Clough that he had previously been incarcerated at OCJ. The court interrupted:

> The court: I know, but I'm speaking to the enumerated --
>
> Counsel for defendants: Well, with regard --
>
> The court: -- tort claim immunities. Are you going to cite anything out of Title [5]9 then? . . . I mean if you haven't, that's fine. But I just, you know --
>
> Counsel for defendants: Well, I think, I think primarily we addressed the provision with regard to the, the mental health itself for failure to, I guess, recognize that he was suicidal, and I cited the case that -- where they

13

had applied it in the context of the, I believe it was Monmouth County Correctional Facility with regard to that [Charpentier v. Godsil, 937 F.2d 859 (3d Cir. 1991)]. Off the, off the top of my head I don't know that there are any other specific tort claim immunities . . . with regard to this specific allegation.

The court: I want to make sure I didn't miss anything. Okay.

Counsel for defendants: I don't think so.

The court: If you didn't brief it, that's fine.

In a written opinion, the trial court granted summary judgment to defendants dismissing plaintiff's Civil Rights Act claim, refused to dismiss plaintiff's negligence claim, and said nothing about the TCA.

On the NJCRA claim, the trial court concluded that "[t]he evidence [did] not support the level of culpability required" for a constitutional violation. As to the negligence claim, the court held that Horn's expert report raised a genuine issue of material fact as to whether Conforti's "suicide was foreseeable and the Ocean County Defendants negligent." The court said nothing about defendant's arguments regarding TCA immunity.

Defendants did not move for reconsideration of the court's failure to respond to their motion as to the TCA.

Before trial, defendants filed a motion in limine about allocating liability with the settled CHS defendants. The motion did not seek to prevent the jury

14

from hearing evidence of any conduct immunized under N.J.S.A. 59:6-4, -5, or -6, and did not mention the TCA. The motion was eventually withdrawn.

At trial, the parties presented competing fact and expert testimony regarding negligence and causation.

Retired OCJ Warden Theodore Hutler highlighted that OCJ was accredited by the National Commission on Correctional Health Care (NCCHC), met all American Correctional Association (ACA) standards, and was nearly 100% compliant with the hundreds of standards on the State Department of Corrections inspection. He affirmed that corrections officers were trained in suicide prevention each year. After a suicide, Warden Hutler stated, he would do a "total review" with his senior staff to determine what, if anything, they could have done differently, and what policies, if any, should be changed. He testified that the jail relied on CHS for all inmate medical and mental health screenings; that the nurses determined whether an inmate was suicidal during intake; and that CHS did not share inmates' medical or mental health information with corrections officers because they believed it was prohibited by HIPAA. He also testified that health and welfare checks were performed in accordance with the State Administrative Code, which required

15

checks to be made once per hour during waking hours. According to Warden Hutler, there was no requirement that the checks be irregularly timed.

Horn testified that OCJ was negligent in failing to maintain accurate records such that they could not even "say with certainty how many suicides there were" at the jail between 2005 and 2010: Warden Mueller testified there were seven; retired Warden Hutler testified there were three to four; and an OCJ document listed eight names, with three crossed out, for a total of five. According to Horn, while the New York City Department of Correction had 0.16 suicides per thousand inmates between 2005 and 2010, OCJ had two per thousand inmates, assuming that the five-suicides figure was correct. Defendants were negligent, Horn testified, by failing to conduct comprehensive mortality reviews or revise OCJ's Suicide Prevention Policy -- which had been promulgated in 1985 and last amended in 1999 -- after the five suicides and the additional fifty-eight suicide or self-injury attempts that occurred at OCJ between 2005 and 2010.

Horn further testified that the County defendants were negligent by providing inadequate training to OCJ staff on preventing inmate suicide and by failing to follow OCJ's existing suicide prevention policies and general correctional standards by: (1) failing to respond when Conforti closed his cell door, which would have immediately notified the control tower officer, and

16

obstructed his cell door window; and (2) completing "systematic and predictable" health checks of the housing units that were easily timed by inmates. Had OCJ staff followed its existing policies, Horn concluded, the "chances of [Conforti] succeeding in committing suicide would have been substantially lowered."

Defendants' expert Jeff Eiser, the former deputy director of the Cincinnati, Ohio jail system, countered that jail staff at OCJ at all times complied with the standards of care established by the New Jersey Administrative Code, ACA, and NCCHC. He testified that OCJ's health and welfare checks were adequate and complied with New Jersey law, and the checks conducted by Corporal Petrizzo on the day of Conforti's death "were irregular" and consistent with OCJ policy. According to Eiser, OCJ had adequate policies, procedures, and practices regarding suicide prevention; its training on suicide prevention complied with ACA standards and was "very current, very up to date"; and no evidence suggested that any lack of training contributed to Conforti's death. Eiser also concluded that Conforti's intake screening complied with ACA standards, was adequate, and did not raise any "red flags"; OCJ staff did not disregard any risk regarding Conforti's safety or mental health; and Conforti was housed appropriately during his October incarceration. An inmate could commit suicide, Eiser emphasized, even when

17

jail staff followed all applicable policies. While Conforti's suicide was tragic, Eiser testified, it was also unforeseeable.

At the close of plaintiff's case, the County defendants moved for a directed verdict. The court denied the motion.

The jury found defendants negligent and apportioned liability 60% against the County defendants and 40% against CHS. The jury awarded plaintiff a total of $150,000 in damages under the Wrongful Death Act, and $1,400,000 for pain and suffering under the Survival Act.

## D.

Defendants moved for judgment notwithstanding the verdict (JNOV), or, in the alternative, for a new trial and remittitur. Among their many contentions, defendants asserted that plaintiff introduced insufficient evidence for a jury to conclude that Conforti's suicide was reasonably foreseeable or that defendants were a proximate cause of Conforti's death. Renewing their summary judgment argument, defendants also maintained that because OCJ was a medical facility under N.J.S.A. 59:6-1, they were entitled to immunity under N.J.S.A. 59:6-4, -5, and -6. Defendants' JNOV brief copied, verbatim, the entire TCA argument from their summary judgment brief.

Applying the correct JNOV standard, the judge denied the motion. On the first point, the trial court reasoned that there was sufficient evidence in

18

Horn's testimony from which a jury could conclude that Conforti's suicide was "reasonably foreseeable to the County Defendants and that the County Defendants' actions were a proximate cause of Mr. Conforti's death." On the second point, the court held that OCJ was not a "medical facility" under N.J.S.A. 59:6-1, and Charpentier v. Godsil "does not stand for the proposition that the Ocean County Jail is a 'medical facility.'"

The court also denied defendants' motion for a new trial and remittitur, finding there was no "manifest denial of justice under the law on liability or damages."

E.

Defendants appealed. Whereas they earlier contended that OCJ was a "medical facility" under N.J.S.A. 59:6-1 and therefore immune under 59:6-4, -5, and -6, they contended for the first time before the Appellate Division that the immunities granted in 6-4, -5, and -6 were not limited to medical facilities and applied instead to certain "activities," regardless of which public entity performed them. According to defendants, 6-4, -5, and -6 immunized "public entit[ies]" and "public employee[s]" for injuries caused by specific activities -- "[n]one of these immunities is limited to a 'medical facility'" under 59:6-1's "general definitions section." The trial court

19

therefore plainly erred in failing to apply TCA immunity, and the "jury's verdict should be set aside and the case dismissed with prejudice."

Plaintiff responded that the jury's verdict "was not based on the Ocean County Defendants' 'failure to make a physical or mental examination,' N.J.S.A. 59:6-4; 'failing to [properly] diagnose,' N.J.S.A. 59:6-5; or failing to 'confine a person for mental illness or drug dependence.' N.J.S.A. 59:6-6." (alteration in original).

The Appellate Division affirmed. Without discussing the text of 59:6-4, -5, or -6, the Appellate Division found "County defendants' arguments misconstrue plaintiff's claims against them," because "[t]he thrust of plaintiff's claims" was that defendants "failed to follow DOC policies and rules for the prevention of inmate suicide." The Appellate Division also noted that because the jury assessed 40% liability against "the CHS defendants who conducted [Conforti's] jail intake, the County defendants' contention that the jury verdict should be set aside because they are not liable for a failure to diagnose is without support. Seemingly, the jury held the CHS defendants were liable for misdiagnosing [Conforti]'s mental condition, not the County defendants."

Detailing the testimony at trial, the Appellate Division concluded that the "conveniently overwritten log entry and unavailable security footage

20

allowed the jury to infer culpability [against the County defendants] from the actual timing of the welfare checks; the amount of time [Conforti]'s cell door was closed, locked, and obstructed; and the time it took DOC staff to respond to the hanging."

F.

We granted defendants' petition for certification, limited to the question of whether defendants were entitled to immunity under N.J.S.A. 59:6-4, -5, or -6. 252 N.J. 53 (2022). We denied plaintiff's cross petition. 252 N.J. 25 (2022). We also granted leave to the New Jersey Association for Justice (NJAJ) and the American Civil Liberties Union of New Jersey (ACLU) to participate as amici curiae.

II.

Defendants maintain they are entitled to absolute immunity under N.J.S.A. 59:6-4, -5, and -6, for plaintiff's claims that defendants failed to properly diagnose or address Conforti's psychiatric and medical conditions. Citing the plain language of the statutory provisions, they argue that the trial court and Appellate Division erred in holding that immunity under 59:6-4, -5, and -6 applies exclusively to "medical facilities" defined in 59:6-1. According to the County defendants, nothing in Chapter Six of the TCA constricts the scope of 6-4, -5, or -6 to "medical facilities"; instead, the provisions grant

21

immunity to certain activities performed by public entities and public employees. Citing <u>Bernstein v. State</u>, 411 N.J. Super. 316, 334-35 (App. Div. 2010), <u>Perona v. Township of Mullica</u>, 270 N.J. Super. 19, 27 (App. Div. 1994), and <u>Parsons ex rel. Parsons v. Mullica Twp. Bd. of Educ.</u>, 226 N.J. 297 (2016), defendants argue they were entitled to TCA immunity and the "jury's verdict" should therefore "be set aside and the case dismissed with prejudice."

Plaintiff endorses the Appellate Division's holding that her claims against defendants focused on defendants' failure to follow and implement suicide prevention policies and procedures, which is not immunized under 59:6-4, -5, or -6. Additionally, plaintiff asserts, 59:6-4 could not help the County defendants because the CHS defendants, who are not entitled to immunity under the Act because they are not public entities or public employees, were largely responsible for "intake and mental health screening evaluations" and "identifying and addressing [Conforti]'s particular medical needs during his OCJ confinement." Likewise for 59:6-5, plaintiff contends, the jury's 40% liability finding against CHS demonstrates that it held CHS "liable for misdiagnosing [Conforti]'s mental condition, not the County defendants."

NJAJ supports plaintiff and makes several additional points on why there is no immunity for County defendants under 59:6-4, -5, or -6. The

22

ACLU maintains that N.J.S.A. 59:2-2 should be used to strengthen the duty of care owed by jailers to incarcerated people in recognition of defendants' "outstanding duty to preserve and protect individual lives in their care and to pursue that care over and beyond any underlying fear of civil suit."

III.

A.

We review motions for summary judgment under the same standard as the trial court. Statewide Ins. Fund v. Star Ins. Co., 253 N.J. 119, 124-25 (2023). In so doing, we "consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Id. at 125 (quoting Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995)).

After the jury has reached a verdict, we review a decision on a JNOV motion pursuant to Rule 4:40-2 under the same standard applied by the trial court. Smith v. Millville Rescue Squad, 225 N.J. 373, 397 (2016). Thus, we consider whether the evidence presented at trial, "'together with the legitimate inferences therefrom, could sustain a judgment in . . . favor' of the party" that prevailed at trial. Sons of Thunder, Inc. v. Borden, Inc., 148 N.J. 396, 415 (1997) (omission in original) (quoting Dolson v. Anastasia, 55 N.J. 2, 5

23

(1969)).  If, "accepting as true all the evidence which supports the position of the party defending against the motion and according [that party] the benefit of all inferences which can reasonably and legitimately be deduced therefrom, reasonable minds could differ," the motion for JNOV "must be denied."  Ibid. (quoting Dolson, 55 N.J. at 5).  The judicial role in ruling on or reviewing such a motion is therefore "mechanical":  the court "is not concerned with the worth, nature or extent (beyond a scintilla) of the evidence, but only with its existence, viewed most favorably to the party opposing the motion."  Ibid. (quoting Dolson, 55 N.J. at 5-6).  In sum, a motion for JNOV may "only 'be granted where no rational juror could conclude that the plaintiff marshaled sufficient evidence to satisfy each prima facie element of a cause of action.'"  Smith, 225 N.J. at 397 (quoting Godfrey v. Princeton Theological Seminary, 196 N.J. 178, 197 (2008)).

The difference between review of a summary judgment motion and a JNOV motion "is that summary judgment motions are generally decided on documentary-evidential materials, while the directed verdicts are based on evidence presented during a trial."  Tomeo v. Thomas Whitesell Constr. Co., 176 N.J. 366, 370 (2003).

We review questions of statutory interpretation de novo.  W.S. v. Hildreth, 252 N.J. 506, 518 (2023).  When interpreting statutory language,

24

"this Court aims to effectuate the Legislature's intent." Ibid. As this Court has repeatedly explained, "[t]here is no more persuasive evidence of legislative intent than the words by which the Legislature undertook to express its purpose," and we thus "first look to the plain language of the statute." Perez v. Zagami, LLC, 218 N.J. 202, 209-10 (2014). We "ascribe[] to the statutory words their ordinary meaning and significance and read[] them in context with related provisions so as to give sense to the legislation as a whole." Hildreth, 252 N.J. at 518 (quoting DiProspero v. Penn, 183 N.J. 477, 492 (2005)). If the plain language of a statute is clear and unambiguous, our task is complete. Ibid.

B.

"[T]he 'guiding principle' of the Tort Claims Act is 'that immunity from tort liability is the general rule and liability is the exception.'" D.D. v. Univ. of Med. & Dentistry of N.J., 213 N.J. 130, 134 (2013) (quoting Coyne v. State Dep't of Transp., 182 N.J. 481, 488 (2005)).

Chapter Six of the TCA is entitled "Medical, Hospital and Public Health Activities." The chapter begins with a "Definitions" section, N.J.S.A. 59:6-1. Included in that section is a definition of "medical facility" as "a hospital, infirmary, clinic, dispensary, mental institution, or similar facility." Ibid. The County defendants argue that, despite that definition -- and the trial court's

25

finding that OCJ did not meet it -- their conduct was immunized by three separate substantive provisions of Chapter Six:  N.J.S.A. 59:6-4, -5, and -6.

N.J.S.A. 59:6-4, "Failure to make physical or mental examination or to make adequate physical or mental examination," grants immunity for certain physical and mental examinations.  It reads in relevant part:

> Except for an examination or diagnosis for the purpose of treatment, neither a public entity nor a public employee is liable for injury caused by the failure to make a physical or mental examination, or to make an adequate physical or mental examination, of any person for the purpose of determining whether such person has a disease or physical or mental condition that would constitute a hazard to the health or safety of himself or others.

The section thus grants "absolute immunity" for a public entity or public employee's "failure to perform an adequate examination" to determine whether a person has a physical or mental condition which would be hazardous to that person or others, and then "establishes an exception to the general rule of absolute immunity if the examination is 'for the purpose of treatment.'"  Kemp by Wright v. State, 147 N.J. 294, 300 (1997) (quoting N.J.S.A. 59:6-4); see also Parsons, 226 N.J. at 310 (finding that "a visual acuity test" by an elementary school nurse "is a 'physical examination' administered to further the public health of students pursuant to N.J.S.A. 59:6-4" and is not

26

undertaken "for the purpose of treatment" because it is a "merely preventative screening[]").

N.J.S.A. 59:6-5, "Immunity from liability for failure to diagnose certain conditions," grants immunity for diagnosing or failing to diagnose a mental illness or a substance abuse disorder involving drugs, and for failing to prescribe treatment for such conditions. It provides:

> a. Neither a public entity nor a public employee is liable for injury resulting from diagnosing or failing to diagnose that a person has a mental illness or is a person with a substance use disorder involving drugs or from failing to prescribe for mental illness or a substance use disorder involving drugs; provided, however, that nothing in this subsection exonerates a public entity or a public employee who has undertaken to prescribe for a mental illness or a substance use disorder involving drugs from liability for injury proximately caused by negligence or by a wrongful act in so prescribing.

The provision thus grants immunity to public entities and employees for diagnosing or failing to diagnose "that a person has a mental illness" or drug use disorder, and from failing to prescribe treatment for a mental illness or drug use disorder.

Lastly, N.J.S.A. 59:6-6, "Determinations in accordance with applicable enactments," grants immunity for decisions regarding whether to confine a person for mental illness or drug dependence, and the terms and conditions of such confinement or release. It prescribes that

27

a. Neither a public entity nor a public employee is liable for any injury resulting from determining in accordance with any applicable enactment:

(1) whether to confine a person for mental illness or drug dependence;

(2) the terms and conditions of confinement for mental illness or drug dependence;

(3) whether to parole, grant a leave of absence to, or release a person from confinement for mental illness or drug dependence.

This last section thus grants immunity to public entities and public employees for "determining in accordance with any applicable enactment," "whether to confine a person for mental illness or drug dependence," the terms and conditions of such confinement, and whether to release a person from such confinement.

Significantly, the words "medical facility" cannot be found in N.J.S.A. 59:6-4, -5, or -6. The text of all three provisions is clear. All three grant immunity to a "public entity" or "public employee" in particular circumstances. None grants immunity only to "medical facilities" or public entities or public employees that qualify as medical facilities.

At the summary judgment stage, defendants asserted they were immune under 59:6-4, -5, and -6, because OCJ was a "medical facility" within the meaning of 59:6-1. Plaintiff opposed immunity, arguing OCJ was not a

28

medical facility under 59:6-1. Defendants now correctly maintain that 59:6-1's definitions section does not limit the substantive immunities provided by 59:6-4, -5, or -6 to "medical facilities." Cf. Allen v. V & A Bros., Inc., 208 N.J. 114, 130-31 (2011) (noting that the operative section of a statute, not its definitional section, determines liability). We also agree with defendants that the immunities set forth in 59:6-4, -5, and -6 are not "inapplicable in jail suicide cases" or "superseded in the jail suicide context."

In theory, therefore, defendants could be immunized from liability for specific conduct under 59:6-4, -5, and -6.

C.

However, because there was evidence here both at the summary judgment stage and during trial from which the jury could have concluded that the County defendants were negligent beyond any immunities possibly granted by N.J.S.A. 59:6-4, -5, and -6, the trial court was correct to refuse to dismiss plaintiff's negligence count at the summary judgment stage and to refuse to overturn the jury's verdict after trial.

At the summary judgment stage, Horn's report opined that the County defendants were negligent by failing to adequately train OCJ staff on preventing inmate suicide; failing to adopt and implement an adequate suicide prevention policy; failing to follow OCJ's existing Suicide Prevention Policy;

29

failing to conduct mortality reviews after inmate suicides and to revise policies accordingly; "[f]ailing to recognize or appreciate the danger of a closed and locked cell door with a towel covering the door either through patrols or video surveillance"; and "[e]ngaging in predictable and easily timed and anticipated patrols of the cell block" for all inmates, when OCJ's Suicide Prevention Policy specifically prohibited easily timed patrols. None of that conduct would be immune under 59:6-4, -5, or -6, which immunize injuries caused by failing to make an adequate physical or mental examination that is not for purposes of treatment, failing to diagnose that a person has a mental illness or drug use disorder or to treat that disorder, and failing to confine a person "for mental illness or drug dependence," and the terms and conditions of such confinement.

Therefore, even though the trial court was wrong in failing to address defendants' arguments under the TCA at the summary judgment stage, it did not err in refusing to dismiss count one of plaintiff's complaint because there was evidence from which a jury could find negligence without reference to any immunized conduct. See, e.g., Chiofalo v. State, 238 N.J. 527, 545 (2019) (noting that "[t]he trial court's focus was on the facts presented, and on that basis we cannot say that the denial of summary judgment . . . was in error" and

30

it is "unfair to reassess the summary judgment record based on arguments that were not advanced").

At trial, the jury then heard voluminous testimony about the County defendants' negligence that was unrelated to any failure to examine, failure to diagnose or treat, or failure to "confine a person for mental illness or drug dependence," or the terms and conditions of such confinement, under 59:6-4, -5, and -6. This included testimony from Horn that OCJ was negligent in failing to be able to "say with certainty how many suicides there were" at the jail between 2005 and 2010; failing to conduct comprehensive mortality reviews or to revise OCJ's Suicide Prevention Policy -- which had been promulgated in 1985 and last amended in 1999 -- after at least five suicides and fifty-eight suicide or self-injury attempts between 2005 and 2010; providing inadequate training to OCJ staff on preventing inmate suicide; failing to respond when Conforti closed his cell door, which would have immediately notified the control tower, and obstructed his cell door window; and failing to follow OCJ's policies and general correctional standards by completing "systematic and predictable" health checks that were easily timed by inmates.

While defendants' expert, Jeff Eiser, refuted Horn's testimony, it was up to the jury to decide which expert to believe. The jury was also free to rely on

the existing OCJ Suicide Prevention Policy, admitted at trial, which provides: "An inmate who is serious about committing suicide will try to estimate a time to carry out his plan when the likelihood of being discovered by someone [is] small. For this reason the officer should make unsystematic patrols of the housing areas." And as the Appellate Division noted, the testimony about the "conveniently overwritten log entry and unavailable security footage" "allowed the jury to infer culpability" against the County defendants for conduct that was unrelated to anything immunized by 59:6-4, -5, or -6.

1.

County defendants claim that "because the case was mishandled by the trial court, the jury was never given an opportunity to distinguish between the sort of negligence we assert would be immunized and the sort of negligence which might not have been." In the County defendants' telling, they were "prejudiced" because "there was no distinction made in terms of what was submitted to the jury."

But that ignores what actually happened both before and during trial. The County defendants moved for summary judgment before trial not to keep specific evidence of immunized conduct away from the jury, but to dismiss count one of plaintiff's complaint: negligence. A fair reading of their summary judgment brief reveals that they argued they were immune from

32

liability for negligence under 59:6-4, -5, and -6 because they were a "medical facility" under 59:6-1. As earlier noted, the trial court erred in failing to respond to that contention. But it did not err in failing to dismiss count one of plaintiff's complaint under 59:6-4, -5, and -6, because the negligence claim was supported by conduct that was not immunized by those sections of the TCA.

Because the trial court's written decision on their motion for summary judgment said nothing about the TCA at all, defendants could have filed a motion for reconsideration. See Rule 4:49-2 (requiring that a motion for reconsideration shall "state with specificity the basis on which it is made, including a statement of the matters or controlling decisions that counsel believes the court has overlooked") (emphasis added). We concur with our dissenting colleagues that a motion for reconsideration is not a means for "defendants to get a second bite at the apple." Post at ___ (slip op. at 31). But if the trial court did not consider TCA immunities in the first instance, even though they were raised by defendants, defendants would not be attempting to relitigate or refine their arguments; rather, they would be requesting that the court review an otherwise overlooked argument that was properly raised in the initial motion. Indeed, "a motion for reconsideration provides the court, and not the litigant, with an opportunity to take a second bite at the apple to correct

33

errors inherent in a prior ruling." Medina v. Pitta, 442 N.J. Super. 1, 18 (App. Div. 2015); see also James H. Walzer, N.J. Practice, Civil Practice Forms § 105:47 (6th ed. 2023) ("[I]n practice the motion [for reconsideration] requires a showing of law or facts presented in the motion papers that were overlooked or misapprehended and would result in a different result.").

Then, although defendants filed a motion in limine about allocating liability with the settled CHS defendants, they did not seek to prevent the jury from hearing evidence of conduct arguably immunized under N.J.S.A. 59:6-4, -5, and -6, including failing to screen Conforti, completing an inaccurate or incomplete screening, or failing to correctly house or place Conforti at OCJ. At the time defendants filed their motion in limine, the trial court had not rejected immunity under those sections; it had simply passed over it.

We agree with our dissenting colleagues that "[a] motion in limine is '[a] pretrial request that certain inadmissible evidence not be referred to or offered at trial.'" Post at ___ (slip op. at 34) (citing Black's Law Dictionary 1109 (9th ed. 2009)). We concur that a motion regarding the "admissibility of evidence," must be one that "if granted, would not have a dispositive impact on a litigant's case." Post at ___ (slip op. at 34) (quoting Jeter v. Sam's Club, 250 N.J. 240, 250 (2022)). We thus agree that granting a motion in limine should not "result in the dismissal of a plaintiff's case." Jeter, 250 N.J. at 250.

34

That is precisely why a motion in limine would have been proper here. As we have already explained, defendants wrongly sought to dismiss plaintiff's entire negligence count on the ground that (as they later articulated clearly to this Court), some of the facts supporting that count concerned conduct that was immunized by N.J.S.A. 59:6-4, -5, and -6. A motion to exclude evidence of conduct immunized by 59:6-4, -5, and -6, therefore, could have been brought as a motion in limine exactly because, if properly granted, it "would not have [had] a dispositive impact on a litigant's case." Ibid.

By definition, a "dispositive motion," "if granted, results in a judgment on the case as a whole, as with a motion for summary judgment or a motion to dismiss." Black's Law Dictionary (11th ed. 2019). Here, a motion to exclude evidence of immunized conduct, properly decided, would not have led to the dismissal of plaintiff's complaint, or even the dismissal of count one of plaintiff's complaint, because plaintiff's negligence count was supported by evidence that is not immunized under any reading of 59:6-4, -5, and -6. A motion in limine requesting that evidence of conduct immunized by 59:6-4, -5, and -6 not be referred to or offered at trial would therefore not have been dispositive. We continue to warn attorneys against filing motions in limine that would "result in the dismissal of a plaintiff's case." Jeter, 250 N.J. at 250.

35

2.

On appeal, defendants maintained that the trial court erred when it "bunched more than a half-dozen disparate theories of negligence against the Jail into a single [jury] charge and question on the verdict sheet, obfuscating any understanding of the basis" of the jury's verdict. They continue that objection here, faulting the trial court for not using a "jury verdict form . . . that would have allowed the jury to distinguish between the sort of negligence in the screening and in the confinement that we assert were immunized from liability and the sort of conduct . . . that might not have been."

But defendants did not request a jury charge that would distinguish between evidence of immunized and non-immunized conduct. Nor did they request a special verdict form or special interrogatory to "pars[e] out the different types of negligence" and ensure that the jury's verdict was based only on non-immunized conduct. Instead, defendants consented to the trial court's charge to the jury and to the jury verdict sheet.

3.

Finally, the County defendants assert they are at least entitled to a new trial because there is "no way of knowing" whether the jury held them liable for immunized or non-immunized conduct.

Defendants' argument that "we don't know what was in the jury's mind" overlooks the standard of review on a JNOV motion. In reviewing a motion for judgment notwithstanding the verdict, a court does not attempt to discern how the jury reached its verdict or what evidence the jury credited versus what evidence it discounted. Instead, the inquiry is only "whether 'the evidence [presented at trial], together with the legitimate inferences therefrom, could sustain a judgment in . . . favor'" of the party that prevailed at trial. Sons of Thunder, 148 N.J. at 415 (omission in original) (emphasis added) (quoting Dolson, 55 N.J. at 5). Here, the evidence presented at trial, along with all legitimate inferences therefrom, could sustain a judgment in favor of plaintiff without reference to any immunized conduct. The trial court was therefore correct to deny defendants' JNOV motion.

4.

We address two other points only briefly. First, because the jury's verdict is supported by non-immunized conduct introduced at trial, this case is simply not like others in which a claim against a public entity or public employee was held immunized by N.J.S.A. 59:6-4, -5, or -6. See, e.g., Bernstein, 411 N.J. Super. at 327, 332-35 (holding that "[e]ven if [the] defendants' treatment or diagnosis" of an inmate who had "suffered from psychological problems and had a history of violent behavior" was negligent,

37

failing to "order[] his segregation from the general prison population" was immune pursuant to N.J.S.A. 59:6-4, -5, and -6); Perona, 270 N.J. Super. at 26-28 (concluding that police officers were immune under N.J.S.A. 59:6-6 for failing to confine a person whose husband believed she was suicidal); Parsons, 226 N.J. at 299-301 (finding that a school district and school nurse were immune from liability under N.J.S.A. 59:6-4 for failing to timely notify parents that their daughter failed a visual acuity test); Charpentier, 937 F.2d at 861, 867 (determining that N.J.S.A. 59:6-5 immunized a physician's alleged negligent failure to transfer an arrestee from a county correctional institution to a medical or psychiatric facility); Predoti v. Bergen Pines Cnty. Hosp., 190 N.J. Super. 344, 345-47 (App. Div. 1983) (holding that N.J.S.A. 59:6-6 immunized a psychiatric hospital's decision to move a patient who suffered from schizophrenia from the "closed ward" to the "open ward," which allowed him to walk the hospital grounds).

Second, because there was non-immunized conduct introduced at trial sufficient to sustain the jury's verdict on plaintiff's negligence count under any construction of 59:6-4, -5, and -6, we need not respond to the parties' or amici's specific arguments about the precise contours of immunity under those

38

provisions.[3] We do, however, note that defendants are correct that the Appellate Division erred when it stated that defendants had no immunity under 59:6-4 "regarding [Conforti]'s medical intake, which was done to assess his OCJ confinement and not conducted for treatment purposes." That is the opposite of what 59:6-4 actually says. N.J.S.A. 59:6-4 applies only to exams that are not conducted "for the purpose of treatment" and explicitly denies immunity when examinations are conducted for treatment purposes. See also Kemp by Wright, 147 N.J. at 300 (noting that N.J.S.A. 59:6-4 "establishes an exception to the general rule of absolute immunity if the examination is 'for the purpose of treatment'").

## IV.

For the reasons stated, the judgment of the Appellate Division is affirmed as modified.

---

[3] This includes plaintiff's assertion that Conforti was "detained on criminal charges" and not "confined for mental illness" under N.J.S.A. 59:6-6; NJAJ's claim that N.J.S.A. 59:6-4 would not apply because all CHS medical intake evaluations and screenings were "for the purpose of treatment," and thus fall under 6-4's "treatment exception"; NJAJ's position that 59:6-5 applies only to physicians or people otherwise authorized to diagnose mental illness or drug dependence; NJAJ's assertion that alcoholism does not fall within 59:6-1's definition of "drug dependence" and there is therefore no immunity under 6-5 or -6; and NJAJ's argument that 6-6 is inapplicable because neither CHS nor the County defendants undertook any process to determine whether to confine Conforti "in accordance with any applicable enactment" and because confinement for violating a restraining order does not constitute "confinement for the care and treatment of mental illness."

CHIEF JUSTICE RABNER and JUSTICES SOLOMON and PIERRE-LOUIS join in JUSTICE WAINER APTER's opinion.  JUSTICE FASCIALE filed an opinion concurring in part and dissenting in part, in which JUSTICE PATTERSON joins.  JUDGE SABATINO (temporarily assigned) did not participate.

Carol Ann Conforti,
individually and as administratrix
ad prosequendum of the Estate of
Kenneth Conforti and as parent
natural guardian and guardian ad
litem of A.C., a minor,

Plaintiff-Respondent,

v.

County of Ocean, Ocean
County Board of Chosen
Freeholders, in their
individual and official capacities,
Ocean County Department
of Corrections, Warden
Theodore J. Hutler, in his
individual and official capacity,
and Corporal Petrizzo,

Defendants-Appellants,

and

Correctional Health
Services, LLC, Prison
Health Services, Inc.,
and Kelly Clough,

Defendants.

JUSTICE FASCIALE, concurring in part, dissenting in part.

1

I entirely concur with four important, well-reasoned conclusions reached by the majority. First, the definition of "medical facility" under N.J.S.A. 59:6-1 "does not restrict the substantive immunities granted in N.J.S.A. 59:6-4, -5, or -6" because "none of those three provisions are limited to medical facilities." Ante at ___ (slip op. at 3). Second, N.J.S.A. 59:6-4, -5, and -6 "grant immunities to public entities and public employees." Ante at ___ (slip op. at 3). Third, "the immunities set forth in N.J.S.A. 59:6-4, -5, and -6 are not 'superseded in the jail suicide context.'" Ante at ___ (slip op. at 3). And fourth, the trial judge correctly denied the County defendants'[1] motion for summary judgment as to that part of the negligence count alleging damages premised on evidence "that falls outside of any immunities granted by N.J.S.A. 59:6-4, -5, and -6." Ante at ___ (slip op. at 3). In other words, the jury correctly considered that part of plaintiff's negligence claim -- plaintiff had the right to proceed with that theory of the case. I therefore concur with those important determinations reached by my colleagues in the majority.

But to the extent that plaintiff's negligence claim is derived from conduct immunized under N.J.S.A. 59:6-4, -5, and possibly -6, the trial judge

---

[1] The "County defendants" are the County of Ocean; Ocean County Board of Chosen Freeholders (in their individual and official capacities); Ocean County Department of Corrections; Warden Theodore J. Hutler (in his individual and official capacity); and Corporal Petrizzo.

2

should have granted the County defendants' summary judgment motion in part, which would have barred such evidence at trial. Such a negligence theory cannot survive the liability immunity granted under the New Jersey Tort Claims Act (TCA), N.J.S.A. 59:1-1 to :12-3. Instead, the judge erroneously denied, in its entirety, their motion for summary judgment seeking to dismiss the negligence count. At trial, the opening statement by plaintiff's counsel set the stage for introducing evidence of negligence against the County defendants derived from conduct immunized under N.J.S.A. 59:6-4, -5, and possibly -6. Plaintiff's counsel then introduced at trial evidence against the County defendants that was immunized under the TCA, and in closing, made statements expressly predicating plaintiff's claim in part on immunized conduct. The cumulative effect of those combined mistakes tainted the jury, was clearly capable of leading to an unjust result, and denied the County defendants a fair trial.

Moreover, I disagree with the notion that trial counsel for the County defendants are at fault for failing to move for reconsideration. For the reasons that I later explain, reconsideration would have been futile. I also dispute the contention that rather than filing a motion for summary judgment seeking to dismiss that part of plaintiff's negligence claim premised on immunized conduct, they should have raised the immunity issue on the eve of trial in

3

limine. The other possible options recognized by my colleagues, such as a special jury charge or verdict sheet, respectfully, were not viable solutions for the County defendants to mitigate the improper introduction of evidence of negligence premised on immunized conduct.

For those reasons, I respectfully concur in part and dissent in part.

I.

It is well-settled "that the 'guiding principle' of the [TCA] is 'that "immunity from tort liability is the general rule and liability is the exception."'" D.D. v. Univ. of Med. & Dentistry of N.J., 213 N.J. 130, 134 (2013) (quoting Coyne v. State Dep't of Transp., 182 N.J. 481, 488 (2005)). This broad immunity applies to a negligence theory derived in part by conduct immunized under the TCA. Accordingly, "a public entity is 'immune from tort liability unless there is a specific statutory provision' that makes it answerable for a negligent act or omission." Polzo v. County of Essex, 209 N.J. 51, 65 (2012) (quoting Kahrar v. Borough of Wallington, 171 N.J. 3, 10 (2002)). Those principles are well settled.

Importantly, when reviewing an order denying a request to dismiss a negligence claim against a public entity, we must bear in mind that public entities are liable "only . . . within the limitations of [the TCA] and in accordance with the fair and uniform principles established [t]herein."

4

N.J.S.A. 59:1-2. The TCA was "designed to reestablish the immunity of public entities while relieving some of the harsh results of the doctrine of sovereign immunity." Alston v. City of Camden, 168 N.J. 170, 176 (2001) (quotation omitted). In general, "the approach of the [TCA] is to broadly limit public entity liability." Ibid. (quoting Harry A. Margolis & Robert Novack, Claims Against Public Entities, cmt. to N.J.S.A. 59:1-2 (2001)).

In this case, the County defendants filed a summary judgment motion seeking dismissal of plaintiff's entire complaint. In addition to a third count against only non-public entities -- collectively referred to here as "CHS" or "the CHS defendants" -- that have since settled with plaintiff and left the case, the complaint asserted two causes of action against the County defendants: negligence (count one) and violations of the New Jersey Civil Rights Act (count two). The judge granted summary judgment in favor of the County defendants as to count two but denied the County defendants' motion for summary judgment as to count one, the negligence claim. The judge did not address in writing the immunities that the County defendants raised.

Plaintiff's negligence claim, however, included multiple allegedly negligent acts or omissions. Count one included allegations that the County defendants lacked training, considering prior jail suicides; failed to adopt an adequate suicide prevention policy; failed to provide mortality reviews;

5

engaged in predictable patrols that were prohibited by the then-existing Suicide Prevention Policy; and failed to recognize or appreciate the danger of a closed cell door with a towel obstructing view inside the cell. Those allegations are not immunized under the TCA. Some of plaintiff's other allegations, however, assert that the County defendants acted negligently by engaging in conduct that was arguably immunized by at least N.J.S.A. 59:6-4 and -5.

Thus, count one of plaintiff's complaint combined allegations that support theories of negligence based on immunized and non-immunized conduct. The County defendants sought summary judgment dismissing all negligence claims. The trial judge erred by failing to grant that part of the motion seeking to dismiss the negligence claim premised on immunized conduct. Fact issues precluded summary judgment as to the County defendants' non-immunized acts.

Although my colleagues point out that plaintiff "interpreted [the County] defendants to be arguing [at the summary judgment stage] that they were entitled to immunity under N.J.S.A. 59:6-4, -5, and -6 because OCJ was a medical facility under N.J.S.A. 59:6-1," ante at ___ (slip op. at 12-13), that interpretation of the County defendants' argument is incomplete. Instead of

6

making only that contention, the County defendants also relied at the summary judgment stage on the plain language of N.J.S.A. 59:6-4 and -5.

Therefore, the trial judge was obligated to apply N.J.S.A. 59:6-4 and -5. Even if the County defendants' trial counsel argued that they were entitled to immunity under N.J.S.A. 59:6-4, -5, and -6 specifically because the OCJ was a "medical facility" as defined by N.J.S.A. 59:6-1, the trial judge should have recognized upon analyzing the text of the statutes that N.J.S.A. 59:6-4, -5, and -6 grant immunity to any "public entity" or "public employee." See ante at ___ (slip op. at 28). The words "medical facility" cannot be found in N.J.S.A. 59:6-4, -5, or -6.

## A.

### 1.

N.J.S.A. 59:6-4, "Failure to make physical or mental examination or to make adequate physical or mental examination," grants immunity for certain physical and mental examinations. It reads in relevant part that

> [e]xcept for an examination or diagnosis for the purpose of treatment, neither a public entity nor a public employee is liable for injury caused by the failure to make a physical or mental examination, or to make an adequate physical or mental examination, of any person for the purpose of determining whether such person has a disease or physical or mental condition that would constitute a hazard to the health or safety of himself or others.

7

N.J.S.A. 59:6-4 grants "absolute immunity," therefore, for a public entity or public employee's alleged failure to "make an adequate examination" to determine whether a person has a physical or mental condition which would be hazardous to that person or others. Ante at ___ (slip op. at 26). The County defendants are immune from liability for alleged negligent conduct that falls under N.J.S.A. 59:6-4.

Without quoting every allegation in the complaint that arguably fits within the immunity contemplated under N.J.S.A. 59:6-4, I refer to some allegations that, taken together, demonstrate plaintiff's negligence theory was based in part on the County defendants' alleged "failure to . . . make an adequate . . . examination" to determine whether Mr. Conforti had a physical or mental health condition that would be hazardous to himself.

> 97. Notwithstanding the inadequacy of the Ocean County Department of Corrections Suicide Prevention policy, adherence to [that policy] would have identified Mr. Conforti as a suicide risk.
>
> 98. This is because, as a result of the first intake evaluation of Mr. Conforti conducted in September of 2010, the jail intake personnel and other jail staff had actual knowledge of Mr. Conforti's alcohol abuse; of his alcohol addiction; of his prior spinal surgery and resulting pain and impairment and of the recent significant deterioration of his marriage.
>
> 99. Mr. Conforti faced a "crisis situation" as identified by the Ocean County Department of Corrections

8

Suicide Prevention policy because of the following factors: 1) the deterioration of Mr. Conforti's family life; 2) Mr. Conforti's feelings of hopelessness and helplessness; and 3) Mr. Conforti's chronic pain.

100. . . . [A]gents, servants and employees of [the County defendants listed in this paragraph] had actual knowledge of this as a result of the intake evaluation of Mr. Conforti in September of 2010 but these problems were ignored in October of 2010.

101. Notwithstanding the presence of factors identified by the Ocean County Department of Corrections Suicide Prevention policy as presenting a risk of suicide, Mr. Conforti was never referred to Medical Staff as being a suicide risk during his October 2010 incarceration.

. . . .

112. . . . [A]gents, servants and employees of [the County defendants] took a "pro forma" approach to the process of assessing this inmate and overlooked serious issues that would have led to a different outcome.

. . . .

116. [The County defendants'] . . . failure to recognize Mr. Conforti presented a risk of suicide based on the first intake evaluation of Mr. Conforti conducted in September of 2010 . . . shows a deliberate indifference toward Mr. Conforti's well-being and was clearly unreasonable and therefore negligent.

[(emphases added).]

9

Plaintiff's opposition to the County defendants' summary judgment motion demonstrates further that plaintiff's negligence theory derives in part from acts immunized under N.J.S.A. 59:6-4 and -5. Consistent with the allegations in the complaint, and pertinent to N.J.S.A. 59:6-4, plaintiff pointed to the County defendants' alleged "failure to . . . make an adequate . . . examination" to determine whether Mr. Conforti had a physical or mental health condition that would be hazardous to himself, as several of plaintiff's responses to the County defendants' statement of material facts reveal:

> 11. During the [October] intake screening . . . Mr. Conforti denied feeling hopeless or helpless.
>
> ADMITTED <u>but</u> see . . . the . . . discrepancy between the first admission in September 2010 and the subsequent admission in October of 20[10].
>
> . . . .
>
> 13. During both mental health screenings Mr. Conforti denied being diagnosed with major depression.
>
> DENIED. The defendants' records speak for themselves <u>but</u>, a jury may reject the proposition that they reflect what Conforti said.
>
> 14. Mr. Conforti was released to the general population without any special doctor's orders.
>
> ADMITTED <u>but</u> . . . [t]he reasons for Mr. Conforti receiving "special doctor's orders" in September 2010 did not change up to the time of the October 2010 incarceration and <u>defendants w[ere] negligent in not reviewing the records pertaining to Mr. Conforti's</u>

<u>September 2010 incarceration and inquiring why Mr. Conforti was not providing the same responses and taking appropriate action</u>.

. . . .

19. During the initial booking process medical and mental health screenings and assessments were contracted by the medical provider.

ADMITTED <u>but</u> the medical provider was operating pursuant to contract with and under the supervision of [the County defendants]. Further, [the <u>County defendants</u>] are <u>responsible for negligence of CHS</u> and were responsible for <u>making sure</u> communications between CHS and other jail personnel was <u>adequate</u> to apprise jail personnel of <u>medical and mental health status</u> of inmates in custody such as Conforti.

20. The nurse and/or mental health [personnel] made the determination as to whether an inmate is suicidal.

DENIED as stated. <u>[The County defendants'] staff also played a role in intake evaluation and assessment of inmates</u>.

21. The corrections officers are not provided with mental health or medical information related to the inmates because of HIPAA regulations.

DENIED as stated. Defendant Hutler testified "I mean, if there was anything that staff . . . needed to know, medical would tell them." . . . Neither CHS nor the County checked the September medical records of Mr. Conforti which would have disclosed he was withholding information and should have led to <u>further inquiry and scrutiny</u> of Mr. Conforti during his October 2010 incarceration.

[(emphases added).]

11

Plaintiff's additional statement of disputed material facts similarly relies on the County defendants' alleged "failure to . . . make an adequate . . . examination," which is arguably immunized under N.J.S.A. 59:6-4:

> 37. . . . [A] jury issue . . . exists as to whether adherence to the Ocean County Department of Corrections Suicide Prevention policy would have readily identified Mr. Conforti as a suicide risk. This is because, as a result of the first intake evaluation of Mr. Conforti conducted in September of 2010, the jail intake personnel and other jail staff had actual knowledge of Mr. Conforti's alcohol abuse; of his alcohol addiction; of his prior spinal surgery and resulting pain and impairment[;] and of the recent "significant loss" resulting from the deterioration of his marriage.
>
> . . . .
>
> 39. Importantly, [the County defendants] had actual knowledge of this as a result of the intake evaluation of Mr. Conforti in September of 2010 and notwithstanding the presence of factors identified by the Ocean County Department of Corrections Suicide Prevention policy as presenting a risk of suicide, the records provided by [the County defendants] . . . reveal Mr. Conforti was never referred to Medical Staff as being a suicide risk during his October 2010 incarceration.
>
> [(emphases added).]

2.

N.J.S.A. 59:6-5 is entitled "Diagnosing or failing to diagnose mental illness or substance use disorder involving drugs." Subsection (a) of N.J.S.A. 59:6-5 provides that

12

[n]either a public entity nor a public employee is liable for injury resulting from diagnosing or failing to diagnose that a person has a mental illness or is a person with a substance use disorder involving drugs or from failing to prescribe for mental illness or a substance use disorder involving drugs; provided, however, that nothing in this subsection exonerates a public entity or a public employee who has undertaken to prescribe for a mental illness or a substance use disorder involving drugs from liability for injury proximately caused by negligence or by a wrongful act in so prescribing.

[(emphasis added).]

N.J.S.A. 59:6-5(a) thus grants immunity to public entities and employees for diagnosing or failing to diagnose "that a person has a mental illness" and from "failing to prescribe for mental illness," such as by ordering a transfer out of a single-bunk cell. The County defendants are immune from liability for alleged negligent conduct that falls under N.J.S.A. 59:6-5.

Without quoting every allegation in the complaint that arguably fits within N.J.S.A. 59:6-5 immunity, I highlight some that, taken together, demonstrate plaintiff's negligence theory was based in part on the County defendants' alleged failure to "prescribe for mental illness," such as Mr. Conforti's transfer out of a single-bunk cell.

102. . . . [O]n September 10, 2010, by Order of the Jail's Physician, Mr. Conforti was to be provided with an extra mattress, pain medication and "no work, no top bunk."

13

103. This is to be contrasted with Mr. Conforti's treatment during his October 20210 incarceration <u>where he was housed in a single[-bunk cell] already occupied by an inmate</u> (assuring he would sleep on the floor) and his complaints of back pain and need for medication were essentially ignored.

. . . .

116. . . . <u>Housing Mr. Conforti in a single[-bunk cell] already occupied by an inmate</u> (ensuring he had no bunk to sleep on) when the officials knew or should have known of Mr. Conforti's severe back pain and limitations based upon his September 2010 incarceration and his risk factors for suicide was deliberately indifferent and certainly unreasonable . . . .

[(emphases added).]

Moreover, consistent with the allegations in the complaint and pertinent to N.J.S.A. 59:6-5, in opposition to the County defendants' motion for summary judgment, plaintiff asserted that "[in September 2010], by Order of the Jail's Physician, Mr. Conforti was to be provided with an extra mattress[,] pain medication and 'no work, no top bunk.'" The submission explained further -- under a heading titled "Mr. Conforti's Excruciating Back Pain and Physical Limitations Were Addressed in September of 2010 But Ignored by [the County defendants] in October 2010" -- that

41. The treatment of Mr. Conforti in September of 2010 starkly contrasts with Mr. Conforti's treatment during his October of 2010 incarceration. <u>In October</u>

14

> of 2010 Mr. Conforti was housed in a single[-bunk cell] already occupied by an inmate and his complaints of medication for back pain were essentially ignored.

[(emphasis added).]

Those facts presented to the trial judge fit within immunity contemplated under N.J.S.A. 59:6-5's "failure to prescribe."

B.

The County defendants recognized correctly that several of plaintiff's allegations touched upon potentially immunized conduct. In response to the allegations set forth in the complaint -- including additional allegations that arguably pertain to immunity granted under N.J.S.A. 59:6-6 -- the County defendants pled the affirmative defense of TCA immunity. Pertinent here are their thirtieth, thirty-first, and thirty-second affirmative defenses asserting the applicability of N.J.S.A. 59:6-4, -5, and -6. They recognized at the pleading stage they had immunity, and they asserted such immunity.

In moving for summary judgment and in oral argument on the motion, counsel for the County defendants again raised the legal immunity issue for the judge to resolve. Counsel argued that the Ocean County Jail (OCJ) is a "medical facility," as defined under N.J.S.A. 59:6-1, and is therefore immunized under "Title 59" of the TCA. The County defendants contended that "any alleged failure to recognize Mr. Conforti's mental state or suicidal

15

inclination is immunized by the plain language of both N.J.S.A. 59:6-4 and 6-5." (emphasis added). They added, "[t]he foregoing notwithstanding, . . . to the extent that [plaintiff alleges that the County defendants] failed to properly diagnose Mr. Conforti's mental state, they are entitled to the immunities provided under the [TCA]." The County defendants contended that they were entitled to summary judgment and a dismissal of the negligence case that was premised on conduct immunized under N.J.S.A. 59:6-4, -5, and -6, regardless of whether the OCJ was deemed a "medical facility."

## C.

Immunity is the default rule under the TCA, and claims based on multiple alleged acts or omissions may touch in part on immunized conduct. Courts must therefore thoroughly analyze immunity issues to ensure that only actionable conduct is raised before the jury. See R. 4:46-2(c) ("A summary judgment or order, interlocutory in character, may be rendered on any issue in the action (including the issue of liability) although there is a genuine factual dispute as to any other issue."). The County defendants should have been held immune from liability for the conduct that clearly falls within N.J.S.A. 59:6-4 and N.J.S.A. 59:6-5.

The majority correctly concluded that the Appellate Division erroneously interpreted N.J.S.A. 59:6-4. Ante at ___ (slip op. at 39). The

16

appellate court erred when it determined that the County defendants had no immunity under N.J.S.A. 59:6-4 "regarding [Mr. Conforti]'s medical intake, which was done to assess his OCJ confinement and not conducted for treatment purposes." Ante at ___ (slip op. at 39) (alteration in original). Under N.J.S.A. 59:6-4, the County defendants' alleged failure to conduct an adequate examination to determine whether Mr. Conforti had a physical or mental health condition that would be hazardous to himself is immunized. The County defendants were therefore entitled to summary judgment dismissing that part of plaintiff's negligence count to the extent that plaintiff's theory is based on immunized conduct under this provision.[2]

Under N.J.S.A. 59:6-5, plaintiff's negligence theory -- based on the County defendants' alleged failure to "prescribe for mental illness," such as a transfer out of a single-bunk cell -- is also immunized. See Charpentier v. Godsil, 937 F.2d 859, 865, 866 (3d Cir. 1991) (explaining that a "natural interpretation" of N.J.S.A. 59:6-5(a) indicates that injury resulting from a failure to prescribe a transfer to a medical or psychiatric facility is immunized,

---

[2] The majority declined to address arguments about "the precise contours of immunity under [N.J.S.A. 59:6-4, -5, and -6]." See ante at ___ & n.3 (slip op. at 39 & n.3). But it cannot be disputed that the County defendants are immunized for a purported failure to "make an adequate examination" to determine whether Mr. Conforti was a danger to himself or others, under N.J.S.A. 59:6-4.

17

but injury resulting from the affirmative act of prescribing is not). Plaintiff alleged the County defendants were negligent for essentially "failing to prescribe" because they housed Mr. Conforti in a single-bunk cell that was already occupied by an inmate. The County defendants are therefore entitled to summary judgment dismissing plaintiff's negligence count to the extent that it is based on immunized conduct under N.J.S.A. 59:6-5.

However, without differentiating between the County defendants' alleged negligence derived from non-immunized conduct and their alleged negligence derived solely from conduct immunized under N.J.S.A. 59:6-4, -5, and possibly -6,[3] the trial judge denied the County defendants' motion on the

---

[3] I would remand to develop the record more fully. The decision to house Mr. Conforti in a single-bunk cell rather than confine him in some other way may constitute a "determination in accordance with any applicable enactment" as to "whether to confine a person for mental illness," or setting "the terms and conditions of confinement for mental illness," pursuant to N.J.S.A. 59:6-6(a)(1), (2). Though they do not point to any "applicable enactments," the County defendants had authority to make the determination as to whether to confine Mr. Conforti under N.J.A.C. 10A:16-12.2, which enumerates various factors to consider when "determining whether to place an inmate on suicide watch or to release an inmate from suicide watch." Thus, because plaintiff alleges that the County defendants were negligent for housing Mr. Conforti in a single-bunk cell "when the officials knew or should have known of Conforti's severe back pain and limitations based upon his September 2010 incarceration and his risk factors for suicide," the County defendants are at least arguably immune under N.J.S.A. 59:6-6(a)(1) or (2) for the decision not to confine Mr. Conforti elsewhere or under different terms or conditions. I would permit counsel to raise relevant arguments as to N.J.S.A. 59:6-6 on remand. Remanding highlights the legal complexity of interpreting at least

18

entire negligence count (count one). That decision was error. The judge should have granted the motion in part and denied it in part.

D.

By virtue of the trial court's erroneous denial of the County defendants' summary judgment motion as to the entire negligence claim, plaintiff was permitted to predicate the negligence claim substantially on conduct that was immunized by the TCA and to present to the jury evidence of immunized conduct along with evidence of non-immunized conduct. In my view, the County defendants were therefore not afforded a fair trial.

Granting partial summary judgment dismissing the portion of plaintiff's negligence claim that was predicated on immunized conduct would have had a dispositive impact on plaintiff's case. Had the trial court partially dismissed the negligence claim, that decision would have barred evidence of immunized conduct at the trial, and limited plaintiff's negligence claim to evidence properly presented to the jury.

The majority states "defendants wrongly sought to dismiss plaintiff's entire negligence count on the ground that (as they later articulated clearly to this Court), some of the facts supporting that count concerned conduct that was

N.J.S.A. 59:6-6, which provides further support for why resorting to an in limine motion would be impracticable.

19

immunized by N.J.S.A. 59:6-4, -5, and -6." Ante at ___ (slip op. at 35) (emphases added). Respectfully, the County defendants presented reasons to dismiss the negligence count as a whole (including that plaintiff failed to establish they breached a duty or proximately caused damage); and they argued for dismissal of the negligence count to the extent that it was premised on conduct immunized by N.J.S.A. 59:6-4, -5, and -6. They proceeded in that fashion because plaintiff alleged in count one of the complaint that County defendants acted negligently, based on both immunized conduct and on non-immunized conduct. Plaintiff's negligence claim was not an all-or-nothing proposition.

Under the Court Rules, trial judges have the discretion to grant in part and deny in part summary judgment motions. See Applestein v. United Board & Carton Corp., 35 N.J. 343, 351 (1961) (explaining that under the predecessor to Rule 4:46-2, "partial summary judgment . . . may encompass less than all the issues arising from a single claim; or it may encompass less than all the claims joined in a single action. In either case, it removes the determined matter from the trial of the case." (citing 6 Moore's Federal Practice P 56.20(3.-2) (2d ed. 1976) (explaining "it is clear that [Federal Rule of Civil Procedure 56] authorizes a summary adjudication that will often fall short of a final determination, even of a single claim; [and] that the term

20

partial summary judgment as applied to an interlocutory summary adjudication is often a misnomer" (emphasis added) (quotation omitted))); see also R. 4:46-2 ("The judgment or order sought shall be rendered . . . if the pleadings . . . show that there is no genuine issue as to any material fact . . . . A summary judgment or order . . . may be rendered on any issue in the action . . . although there is a genuine factual dispute as to any other issue . . . ." (emphases added)); R. 4:46-3 ("If . . . under this rule judgment is not rendered upon the whole action . . . and a trial is necessary," the trial court, "by examining the pleadings . . . shall, if practicable, ascertain what material facts[] . . . exist without substantial controversy and shall thereupon make an order . . . directing such further proceedings in the action as are appropriate.").

Plaintiff was entitled to a jury trial on the portion of the negligence claim that was premised on genuinely disputed issues of non-immunized acts. The judge, therefore, correctly denied that part of the motion. But the County defendants were entitled to summary judgment dismissing the part of plaintiff's negligence claim derived from immunized conduct under the TCA. The judge should have granted that part of the motion as a matter of law.

Despite my colleagues' contention that the County defendants "believed they were entitled to immunity under 6-4 and 6-5 only because OCJ was a medical facility under 6-1," ante at ___ n.2 (slip op. at 12 n.2), the County

21

defendants' submission that immunity was inextricably tied to the OCJ being a "medical facility" cannot relieve the judge's obligation to read N.J.S.A. 59:6-4, -5, and -6 -- the very provisions that the County defendants brought to his attention. Just as an appellate court may affirm a trial court order for reasons different from those espoused by the trial court in issuing the order, see Hayes v. Delamotte, 231 N.J. 373, 387, 175 (2018), a trial court's legal determinations are similarly not constrained by the parties' arguments on matters of statutory interpretation. Indeed, it is legislative intent -- not parties' arguments -- that is the "overriding goal" of statutory interpretation. See Young v. Schering Corp., 141 N.J. 16, 25 (1995).

Had the judge interpreted 6-4 and 6-5 correctly, he would have seen that the County defendants were entitled to immunity regardless of whether OCJ was a "medical facility." The majority acknowledges that the trial judge was "wrong in failing to address defendants' arguments under the TCA at the summary judgment stage." Ante at ___ (slip op. at 30, 33). I add that the judge was wrong in failing to address the County defendants' arguments that they were entitled to immunity under the plain text of the TCA at the JNOV stage as well. The predicament in which the County defendants found themselves at trial was completely avoidable had the judge granted the motion in part.

E.

Instead, immunized conduct was admitted into evidence at trial. Introducing evidence of conduct immunized under the TCA to prove negligence against the County defendants is reversible error, which is error "clearly capable of producing an unjust result." R. 2:10-2. Under the facts of this case, the error was not harmless. An error cannot be harmless if there is "'some degree of possibility that [the error] led to an unjust result.' For an error to be reversible under the harmless error standard, '[t]he possibility must be real, one sufficient to raise a reasonable doubt as to whether [the error] led the jury to a verdict it otherwise might not have reached.'" Willner v. Vertical Reality, Inc., 235 N.J. 65, 79 (2018) (alterations in original) (quoting State v. Lazo, 209 N.J. 9, 26 (2012)).

The opening and closing remarks by plaintiff's counsel, together with the totality of evidence adduced at trial pertaining to immunized conduct under N.J.S.A. 59:6-4 and -5, tainted the jury and requires a new trial.

For example, plaintiff's counsel opened to the jury by addressing the County defendants' alleged failure to determine whether Mr. Conforti had a physical or mental condition that would be hazardous to himself. He asserted that "jail staff" failed to "compare[] . . . [the] treatment records, [and] the medication records" and asserted that, had they done so, the "suicide could

23

have been prevented." Counsel explained "there was a lack of an appropriate level of communication between medical staff and corrections officers" and that there was a lack of "heightened evaluation" by the County defendants. He added that the County defendants were "responsible for monitoring, supervising, and overseeing" CHS, an entity that had been "hired to provide medical services" in the OCJ. The strong implication of those remarks is that the County defendants engaged in immunized conduct under N.J.S.A. 59:6-4 by failing to "make an adequate examination" to determine whether Mr. Conforti was a danger to himself or others.

Along those lines, plaintiff's corrections liability expert, Martin Horn, testified that during the intake process, the OCJ "check[s] [a prisoner's] physical and mental condition" and "screen[s] for mental illness." He explained, "You want to make sure the person is not acutely mentally ill, that they're not psychotic," and "you want to screen for suicide." He opined that the County defendants "negligently failed to identify" Mr. Conforti as a suicide risk. Again, the County defendants' failure to "make an adequate examination" to determine whether Mr. Conforti was a danger to himself is immunized under N.J.S.A. 59:6-4 and should not have been part of plaintiff's negligence theory against the County defendants.

24

Plaintiff's evidentiary focus should have been on non-immunized conduct, particularly because plaintiff had settled with CHS on the separate claim against the non-immunized CHS defendants for improperly evaluating Mr. Conforti for suicidal ideation. Allowing evidence of and arguments as to immunized conduct alongside those properly focused on non-immunized conduct unfairly enlarged the scope of admissible evidence of negligence and could well have swayed the jury.

And contrary to the Appellate Division's suggestion, the jury's partial allocation of liability to the CHS defendants does not tend to show that the improper admission of evidence, and arguments related to immunized conduct, were harmless. The Appellate Division, which did not address the plain text of N.J.S.A. 59:6-4, -5, or -6, affirmed the trial court's judgment. It noted that the jury assessed forty percent liability against "the CHS defendants who conducted [Mr. Conforti's] jail intake" and speculated that "[s]eemingly, the jury held the CHS defendants were liable for misdiagnosing [Mr. Conforti]'s mental condition, not the County defendants."

Respectfully, even if that conjecture were true, plaintiff introduced evidence that resulted in a fundamentally unfair trial, including that the County defendants, not CHS, "negligently failed to identify" Mr. Conforti as a suicide risk. Failure to "make an adequate examination" to determine whether Mr.

25

Conforti was a danger to himself is immunized and therefore should not have been a part of plaintiff's negligence theory against the County defendants. The opening and closing statements and the totality of the evidence of immunized conduct admitted at trial significantly tainted the verdict, which cannot be saved by the forty percent allocation to CHS.

## II.

The majority references options that the County defendants had after the judge denied their summary judgment motion. But none of those options can offset the damage done through the erroneous admission of evidence and arguments relating to immunized conduct.

## A.

My colleagues explain, for example, that the County defendants could have moved for reconsideration, or they could have filed an in limine motion seeking to bar at trial admission of conduct immunized under the TCA. Ante at ___ (slip op. at 33-35). That begs the question of whether immunized conduct should have been precluded at the summary judgment stage, but I respectfully disagree with the proposition that those possibilities were viable, or that they would have ensured a fair trial based on evidence properly before the jury.

26

To be sure, immunized conduct could and should have been precluded at the summary judgment stage. At oral argument before the trial judge, counsel for the County defendants relied on her brief "as to the [TCA] for the mental health assessment." Her brief quoted N.J.S.A. 59:6-4, -5, and -6, and argued that the County defendants were immunized under the "plain language of both N.J.S.A. 59:6-4 and 6-5." (emphasis added). At oral argument, the judge asked counsel "what, if any, immunities come into play?" The judge added, "Are you going to cite anything out of Title [59] then?" Counsel repeated her argument pertaining to "the mental health itself for failure to . . . recognize that [Mr. Conforti] was suicidal," then she stated, "I don't know that there [is] any other specific tort claim immunities [other than those briefed.]" The judge responded, "If you didn't brief it, that's fine." Of course, counsel briefed N.J.S.A. 59:6-4, -5, and -6, including independent reliance on the plain text of 6-4 and 6-5, but the judge nonetheless denied the motion.

Respectfully, the exchange between counsel for the County defendants and the trial judge highlights the futility of the majority's alternative suggestions, such as moving for reconsideration. Rule 4:49-2 governs motions for reconsideration. "The rule applies when the court's decision represents a clear abuse of discretion based on plainly incorrect reasoning or failure to consider evidence or a good reason for the court to reconsider new

27

information." Pressler & Verniero, Current N.J. Court Rules, cmt. 2 on R. 4:49-2 (2022). And when considering whether to file such a motion, we are mindful that

> a reconsideration motion is primarily an opportunity to seek to convince the court that either 1) it has expressed its decision based upon a palpably incorrect or irrational basis, or 2) it is obvious that the court either did not consider, or failed to appreciate the significance of probative, competent evidence.
>
> [Kornbleuth v. Westover, 241 N.J. 289, 301 (2020) (emphasis added) (quoting Guido v. Duane Morris LLP, 202 N.J. 79, 87-88 (2010)).]

The majority points out that trial counsel for the County defendants should have filed a motion for reconsideration after the judge, in his written decision, did not address their claim that they are entitled to immunity for all allegedly negligent acts that fall under N.J.S.A. 59:6-4, -5, and -6. See ante at ___ (slip op. at 33-34) ("[I]n practice the motion [for reconsideration] requires a showing of law or facts presented in the motion papers that were overlooked or misapprehended and would result in a different result." (quoting James H. Walzer, N.J. Practice, Civil Practice Forms § 105:47 (6th ed. 2023))). However, the majority also notes that the County defendants' "JNOV brief copied, verbatim, the entire TCA argument from their summary judgment brief." Ante at ___ (slip op. at 18). The trial judge explicitly rejected the County defendants' immunity argument that time. Since the trial judge later

28

expressly addressed and rejected the immunity claim, the County defendants could not have avoided the prejudice of admission of evidence of immunized conduct at trial by moving for reconsideration of the summary judgment decision.

The majority also appears to state that the trial judge failed to address the immunity issue at the summary judgment stage, and then erroneously determined at the JNOV stage that N.J.S.A. 59:6-4, -5, and -6 immunity does not apply, in part because the County defendants' verbatim argument missed the mark. The majority recounted that the trial judge "unsuccessfully tried to elicit additional information about [the County] defendants' TCA arguments," ante at ___ (slip op. at 13-14), which suggests to me that my colleagues view the County defendants' contentions at the summary judgment stage as lacking in some regard. Along those lines, my colleagues point out that County defendants argued "for the first time before the Appellate Division that the immunities granted in 6-4, -5, and -6 were not limited to medical facilities and applied instead to certain 'activities,' regardless of which public entity performed them." Ante at ___ (slip op. at 19). Although I highlighted the County defendants' arguments at the summary judgment stage that they relied on the plain text of N.J.S.A. 59:6-4 and -5, ante at ___ (slip op. at 21-22), the majority stated that those contentions of immunity were dependent on the

29

premise that "OCJ was a medical facility under 6-1," <u>ante</u> at ___ n.2 (slip op. at 12 n.2).

Motions for reconsideration are ordinarily made to correct a mistake made by the trial court. <u>Rule</u> 4:49-2's purpose is not to afford a party the opportunity to write a better brief, to introduce new evidence, or to introduce a new argument. <u>See, e.g.</u>, <u>Capital Fin. Co. of Del. Valley, Inc. v. Asterbadi</u>, 398 N.J. Super. 299, 310 (App. Div. 2008) ("Reconsideration cannot be used to expand the record and reargue a motion. . . . A motion for reconsideration is . . . not [designed] to serve as a vehicle to introduce new evidence in order to cure an inadequacy in the motion record.").

A decision to file for reconsideration necessarily involves judgment on the part of counsel that the trial court abused its discretion. An abuse of discretion "arises when a decision is 'made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'" <u>Flagg v. Essex Cnty. Prosecutor</u>, 171 N.J. 561, 571 (2002) (quoting <u>Achacoso-Sanchez v. INS</u>, 779 F.2d 1260, 1265 (7th Cir. 1985)). Thus, the impetus for filing a reconsideration motion is that counsel seeks to correct a trial court mistake.

In my view, the trial judge indeed erroneously denied summary judgment insofar as plaintiff's negligence theory was based on immunized

30

conduct. To the extent that the majority finds that the County defendants' arguments on the immunity issue were deficient, it would not have been proper for the County defendants to get a second bite at the apple, so to speak, by refining their immunity arguments via a motion for reconsideration. The trial court's error should have been corrected on appeal, not on a motion for reconsideration.

Even if the County defendants argued on their summary judgment motion that they were "immune from liability for negligence under N.J.S.A. 59:6-4, -5, and -6 because they were a 'medical facility' under N.J.S.A. 59:6-1," ante at ___ (slip op. at 32-33), the trial judge's analysis should not have stopped there. The judge should have rejected that contention, like the majority and I do now, and then proceeded to analyze whether the plain language of those provisions grants immunity and requires summary judgment dismissing the negligence count to the extent that it is based on that immunized conduct. As the record makes clear, the County defendants' immunity argument was based on more than whether the OCJ was a "medical facility." Counsel contended the plain language of (at least N.J.S.A. 59:6-4 and -5) immunized the County defendants for "fail[ing] to recognize Conforti's mental state or suicidal inclination." The trial judge erred as a matter of law.

31

Most likely, the County defendants did not move for reconsideration for a simple reason:  any such motion would have been futile.  That became obvious when they moved for judgment notwithstanding the verdict (JNOV) and reargued essentially the same position that they raised at the summary judgment stage, namely that they were entitled to dismissal of that part of the negligence case based on immunized conduct.  The trial judge denied the JNOV motion and concluded correctly that the OCJ was not a "medical facility."  But the definition of "medical facility" under N.J.S.A. 59:6-1 does not restrict the substantive immunities granted in N.J.S.A. 59:6-4, -5, or -6, because none of those three provisions are limited to medical facilities.  At that post-trial stage, the trial court maintained its erroneous view of the question of immunity.

Thus, even though the OCJ is not a "medical facility," on the JNOV motion the judge should have analyzed whether plaintiff's negligence claim is derived in part from conduct immunized under N.J.S.A. 59:6-4, -5, and -6.  In failing to do so, the judge failed to do precisely what the majority suggests the County defendants could have argued for on reconsideration.  The fact that the County defendants lost at the JNOV stage supports the conclusion that moving for reconsideration of the order denying summary judgment would have been unavailing.

32

The majority correctly recites the standard for reviewing JNOV motions. The question ordinarily is only "whether 'the evidence [presented at trial], together with the legitimate inferences therefrom, could sustain a judgment in . . . favor'" of the party that prevailed at trial. Sons of Thunder v. Borden, Inc., 148 N.J. 396, 415 (1997) (omission in original) (quoting Dolson v. Anastasia, 55 N.J. 2, 5 (1969)). But this was far from an ordinary case where we apply that standard. Although the majority states that "the evidence presented at trial, along with all legitimate inferences therefrom, could sustain a judgment in favor of plaintiff without reference to any immunized conduct," ante at ___ (slip op. at 37), application of that standard does not account for the cumulative mistakes that were clearly capable of leading to an unjust result, which denied the County defendants a fair trial. While the majority correctly observes that the jury properly heard evidence of non-immunized conduct sufficient to sustain a judgment in plaintiff's favor, the question on review of the trial errors, including the order denying summary judgment in part and the order denying JNOV, is whether the improper admission of evidence of immunized conduct under the TCA was "clearly capable of producing an unjust result." R. 2:10-2.

Regarding the motion in limine that the majority, in hindsight, opines that the County defendants should have filed, the County defendants followed

33

our common law and Court Rules by <u>not</u> moving to bar evidence immunized by N.J.S.A. 59:6-4, -5, and -6. A motion in limine is "[a] pretrial request that certain inadmissible evidence not be referred to or offered at trial." <u>Black's Law Dictionary</u> 1109 (9th ed. 2009). More specifically, under our Court Rules, it is "an application returnable at trial for a ruling <u>regarding the conduct of the trial</u>, <u>including admissibility of evidence</u>, which motion, if granted, <u>would not have a dispositive impact on a litigant's case</u>." <u>Jeter v. Sam's Club</u>, 250 N.J. 240, 250 (2022) (first and second emphases added) (quoting <u>R.</u> 4:25-8(a)(1)). "A motion in limine is not a summary judgment motion that happens to be filed on the eve of trial." <u>Ibid.</u> (quotation omitted). A motion that results in the dismissal of a plaintiff's case is instead subject to <u>Rule</u> 4:46, which governs summary judgment motions. <u>Ibid.</u> Here, granting a motion in limine would have been improper because it would have resulted in dismissal of plaintiff's negligence claim based on immunized conduct, which would have a dispositive impact on plaintiff's case.

At any rate, a motion seeking a determination of complicated legal immunity principles under the TCA, respectfully, should be made well before trial and under <u>Rule</u> 4:46. Indeed, a purely legal question, such as whether TCA immunity applies, should be resolved at an early stage of the litigation. <u>See</u> <u>Rivera v. Gerner</u>, 89 N.J. 526, 536 (1982) (noting that resolving issues

34

involving the TCA at the pretrial stage "is to be encouraged").  Furthermore, this Court has observed that "for purposes of judicial economy, a public entity . . . should assert [TCA] immunity in a pre-trial motion for summary judgment, which, if successful, will bring the litigation to an end," and that "delay in raising several claims of immunity until the time of trial" causes concern.  See Maison v. N.J. Transit Corp., 245 N.J. 270, 298 (2021).  From a practical perspective, it would be unreasonably burdensome for the trial judge to manage such an in limine motion, especially given that here plaintiff's counsel filed at least seven other in limine motions on the eve of trial.

Waiting until an in limine motion to address the complicated and substantial immunity-related legal questions, which require statutory interpretation, will add unnecessary distractions on the eve of trial.  The lawyers will have to wait until right before the trial begins to see how the ruling will affect their opening statements; the trial judge will have to juggle a complicated legal question at the last minute, read the legal briefs, and entertain oral argument; jurors will be waiting in the jury assembly room; there might be an emergent application seeking permission to file a motion on short notice challenging the ruling; witnesses lined up to testify might be dismissed; plaintiff's counsel will have to spend time opposing such in limine motions rather than devoting their time to trial; and so on.

35

My colleagues correctly continue to "warn attorneys against filing motions in limine that would 'result in the dismissal of a plaintiff's case.'" Ante at ___ (slip op. at 36) (quoting Jeter, 250 N.J. at 250). Clearly, the rationale behind TCA immunity is not to permit a negligence suit against a public entity premised on evidence of immunized conduct; allow the case to proceed through the rigors of pre-trial discovery, including obtaining expert reports addressing the immunized conduct; then, on the eve of trial, file a motion in limine to bar evidence of such immunized conduct. See Polzo, 209 N.J. Super. at 51, 56 ("[A] public entity is 'immune from tort liability unless there is a specific statutory provision' that makes it answerable for a negligent act or omission." (quoting Kahrar, 171 N.J. at 10)).

Hypothetically, had plaintiff separated the negligence claims into two counts, one premised on immunized conduct and one premised on non-immunized conduct, then my colleagues and I would no doubt agree that the County defendants should file a motion for summary judgment dismissing the negligence count premised on immunized conduct, rather than waiting until the trial to bar evidence of immunized conduct. The fact that plaintiff elected to include both theories of negligence in one count does not change the analysis. The County defendants were clearly entitled to dismissal of that part of the

36

negligence count premised on conduct immunized under the TCA. That ruling would have barred evidence of immunized conduct at trial.

We granted defendants' petition for certification, as my colleagues have said, "limited to the question of whether defendants were entitled to immunity under N.J.S.A. 59:6-4, -5, or -6. 252 N.J. 53 (2022)." Ante at ___ (slip op. at 21). I respectfully submit that when a public entity is immune from tort liability, like here, for all the reasons that I have articulated, the public entity should bring that part of the litigation premised on immunized conduct to an end under Rule 4:46.

I therefore disagree with the majority's contention that the trial court's erroneous interpretation of the TCA could have been corrected if the defendants had filed a motion in limine.

B.

My colleagues in the majority suggest other possible options beyond motion practice that the County defendants could have employed during the trial to address evidence that, in my view, should have been barred by a partial dismissal of the negligence count that pled immunized conduct. My colleagues suggest that the County defendants could have requested a jury charge distinguishing between immunized and non-immunized conduct, and that they could have proposed a verdict sheet that parsed out different types of

37

negligence to ensure the verdict was based on non-immunized conduct.  <u>Ante</u> at ___ (slip op. at 36).  I respectfully disagree that those options were viable.

Preliminarily, I note as to CHS, the County defendants sought allocation of liability under <u>Young v. Latta</u>, 123 N.J. 584, 591 (1991) (permitting "a non-settling defendant's right to a credit reflecting the settler's fair share of the amount of the verdict -- regardless of the actual settlement -- [which] represents the judicial implementation of the statutory right to contribution").  Plaintiff filed a motion to preclude the County defendants from contending CHS was liable.  Plaintiff argued to the trial judge that defendants should be prevented from pointing the finger at the "empty chair" and arguing to the jury "that this is all [CHS's] fault."  Counsel for plaintiff contended "none of the settling defendants should be on the verdict sheet."  Nevertheless, CHS was correctly listed on the verdict sheet.

With that in mind, requesting a special jury charge that would "distinguish between evidence of immunized and non-immunized conduct" could well have done more harm than good.  Here, the trial judge denied the County defendants' motion for summary judgment seeking to dismiss the negligence count, at least to the extent that the negligence theory was derived from immunized conduct.  The consequence of that ruling permitted plaintiff to utilize immunized conduct to show the County defendants were partly

38

negligent. In that context, a jury charge distinguishing between immunized and non-immunized conduct would have tainted the jury further by focusing them on the County defendants' immunized conduct. Drawing the jurors' attention to immunized conduct erroneously admitted into evidence would frustrate the Legislature's intent. See D.D., 213 N.J. at 133-34 (explaining the longstanding principle that the overall approach of the TCA is to broadly limit public entity liability). In other words, allowing into evidence immunized conduct against the County defendants to prove they were negligent, and then instructing jurors not to consider it, would be prejudicial and inconsistent with immunity principles under the TCA. See Priolo v. Compacker, Inc., 321 N.J. Super. 21, 29-30 (App. Div. 1999) ("It is wrong to suggest that anything a jury hears can be remedied by a curative instruction. Trial management is difficult enough in dealing with the unforeseen or inadvertent comment or answer. A trial judge's responsibility is to minimize such errors."). Here, introducing immunized conduct as evidence of negligence, respectfully, could not be remedied by a special jury charge or curative instruction.

The same logic applies to the suggestion that the County defendants could have asked for a special verdict sheet to "'pars[e] out the different types of negligence'" and to ensure further that the jury's verdict was "based only on non-immunized conduct." Ante at ___ (slip op. at 36). Respectfully, doing so

39

would have exacerbated the situation.  It would have tainted the jury further by focusing them on plaintiff's theory that the County defendants were liable based on immunized conduct.

The majority points out that counsel for the County defendants consented to the charge and verdict sheet.  This is not a situation, however, where a party ignored a trial error.  Denying in full their summary judgment motion constituted the error, and defendants' position was preserved for appeal.  Denial of the motion presented opportunities for plaintiff to admit evidence that simply should not have been presented to the jury.  The fact that the County defendants thereafter consented to the charge and verdict sheet does not mean, given this record, that they waived the argument that they were entitled to summary judgment to the extent plaintiff's negligence theory derives from immunized conduct.  And certainly it would not prevent them from arguing on appeal that they received an unfair trial that requires a do-over.

Regardless, none of the procedural and substantive options suggested by the majority were necessary to preserve the immunity issue for appeal.  The County defendants did that by raising affirmative defenses, filing a motion for summary judgment, and renewing those arguments after trial on their JNOV motion.

III.

In my view, the trial court erred when it denied the County defendants' motion for summary judgment to dismiss plaintiff's negligence claim in its entirety and did not recognize that the claim was predicated in part on immunized conduct. That error denied the County defendants a fair trial. I would reverse the Appellate Division's judgment and remand this matter for a retrial in which plaintiff would be permitted to present only evidence of non-immunized conduct in support of the negligence claim. I therefore respectfully concur in part and dissent in part.